THE STATE OF NEVADA, Respondent, *v.* RICHARD
COOPER FITCH, Appellant

No. 3504

December 20, 1948.                    200 P.2d 991.

670

*E. P. Carville* and *F. Morgan Anglim,* both of Reno, for Appellant.

*Alan Bible,* Attorney General, *Geo. P. Annand* and *Homer Mooney,* Deputy Attorneys General and *Robert E. Jones,* District Attorney, of Las Vegas, for Respondent.

## OPINION

By the Court, WINES, District Judge:

After the trial of the above-entitled action in the Eighth judicial district court, in and for the State of Nevada, county of Clark, the jury returned a verdict and found the defendant guilty of murder in the first degree,

and fixed the penalty at life imprisonment. Thereafter within the time, limited by law, a motion for a new trial was made and denied, and the defendant has appealed to this court from the verdict of the jury, the judgment and order of the district court pronounced in conformity therewith and order of the district court denying the motion of the defendant for a new trial, also the order denying the motion of the defendant for arrest of judgment. The record does not show that a motion for arrest of judgment was made by appellant.

The defendant has set out six assignments of error, and as each will be dealt with separately, it will not be necessary to list them at this point.

As the first assignment is that the verdict of the jury is against the weight of evidence, disposition of this point necessitates setting out the facts in some detail.

A summary, in narrative form, of the state's case in chief, the defense and the rebuttal, offers a convenient form for stating the contention intelligibly, and we proceed to this, noting here that whenever possible we shall avoid repetition of facts not disputed.

On November 18, 1946, taking the two children who were then residing at home, Simone Fitch left Sherman Oaks, California, where she had been living with her husband, the appellant in this case. She was accompanied by John Weer and driven by him in his car, a black Ford V-8 sedan. She left a note for the appellant which read as follows: "Dick, I have left you. I could not any longer stand your brutality as well. No one knew where I will go or for how long. I have sold few things to keep me going for awhile anyway. Best Luck. Simone."

Simone Fitch and John Weer drove first to Mojave, California, and from there they went to Las Vegas, Nevada, where they stayed overnight, registering at a hotel as man and wife. The next day they removed to Carver Park, Nevada, near Las Vegas, rented an apartment on West Lincoln Street, being apartment 6-C in a federal housing project. The children were entered in

school under the name of Weer, and John Weer and Simone Fitch continued to live there as man and wife until November 30, 1946.

On the evening of November 18, 1946, the appellant returned home from his employment at a moving picture studio and discovered the note left by Simone Fitch. Very shortly after the departure of Simone Fitch the appellant learned that she had not left alone but in the company of "Jack" Weer, although he did not discover where Simone Fitch and Jack Weer had gone until about November 29, 1946. In the interval he made numerous inquiries concerning Jack Weer and as to his whereabouts and after learning where John Weer had been living in California, broke into his cabin and there obtained sufficient information to enable him to discover the whereabouts of Simone Fitch and Jack Weer. In addition to making inquiry concerning Jack Weer, the appellant in numerous conversations had with Leonard Reed, Mr. Jean Meunier and Mrs. Jean Meunier, discussed Jack Weer and threatened on many occasions to kill him. This threat was often made in the most vile terms. After the appellant acquired a knowledge of whom Simone Fitch had left with appellant stated that he would hunt him down as a fugitive and kill him. To each of the persons above named appellant made the statement that he could kill Jack Weer and escape punishment under the "Unwritten Law," and was admonished by each of these persons not to attempt this. Leonard Reed gave as his reason the fact that Simone Fitch had been as aggressive in establishing the relationship with Weer as Weer himself. He was told by Mr. Jean Meunier that he did not think the "Unwritten Law" applied, and by Mrs. Jean Meunier that it would lead to disgrace for himself and his family, that the law would not apply; further that the appellant himself had been guilty of intruding on the marriage of Simone Fitch and her previous husband, J. K. Freeman, and that perhaps Simone Fitch was justified in leaving

him because of his acts of cruelty to her and the children. Mrs. Jean Meunier, on the witness stand, related a number of instances when she had seen acts of cruelty by appellant toward his wife and children.

As above stated the appellant discovered on or about November 29, 1946, the whereabouts of Simone Fitch and John Weer and on that night asked for and received, two letters which he had left with Mrs. Jean Meunier to be forwarded to his wife, and on that night stated that they (Mr. and Mrs. Meunier) would see his name and Simone Fitch's name in the headlines.

On November 30, 1946, appellant left Sherman Oaks, Californnia, by automobile and drove to Las Vegas, Nevada, and among the various items carried in the car was a .45 calibre Colt revolver. On the way into Las Vegas appellant picked up two hitchhikers and somewhere on the road the gun was fired from the moving automobile for the purpose of discovering if it would work. After they had reached Las Vegas the two hitchhikers left appellant and he then picked up another hitchhiker who directed him to Carver Park, which is near Las Vegas.

After reaching Carver Park appellant drove out to the desert and changed his clothes. He then returned and began searching for the apartment in which John Weer and Simone Fitch were living. At about the hour of 6 or 6:30 o'clock p. m., the appellant reached the apartment in which they were living. He broke the glass in the front door with the gun, stepped into the room with the gun in one hand, and a raincoat over his arm. Thereafter a struggle occurred and during the struggle three shots were discharged from the gun which appellant carried. The gun which the appellant was carrying would only fire three times without reloading. The appellant, his wife and John Weer were the only persons present in the room at the time of the shooting, and each of these persons suffered wounds in the struggle.

An autopsy of the deceased (John Weer) showed a bullet wound about 4″ below his left nipple on the left side of the chest, and the bullet had ranged downward making its exit at above the right ilium. The wound on the left side of the chest bore evidence of powder burn. There was a second bullet wound approximately ½″ below the lobe of the right ear, and the bullet traveled in an upward direction making its exit at about 2″ in front of the lobe of the left ear. Distinct marks of powder burn appeared at the entrance of the wound on the right side of the head. This bullet severed a jugular vein causing severe hemorrhage which resulted in death within a few minutes. The left jaw had been fractured by this bullet and the third molar was missing from the left jaw.

Examination of Simone Fitch showed that a bullet had entered over the right tibia, approximately 5″ below the knee, passed through the tibia ranging downward and exiting about 4″ below. An X-ray examination showed a multiple fracture of the right tibia. On the left forearm of Simone Fitch there was a laceration approximately ¾″ in length. This wound had the appearance of a tear, and directly underneath there was a small puncture wound from which a tooth was later extracted. When this tooth was extracted it was found to be a third molar. There was no evidence of powder burn around either of these wounds.

When appellant was examined it was determined that he had a laceration on the inside of the upper right leg 9″ above the knee and on the right kneecap. Both of these wounds gave the appearance of powder or bullet burns. There was a puncture wound between the second and third metatarsal of the right foot and thereafter a bullet was removed from this wound.

The room in which this affray occurred was disarranged. A small table radio was found on the floor, some broken dishes and food were also found on the floor and a chair was broken. There was a large pool of blood toward the center of the room and a heater

having an enamel finish was chipped. One bullet was found in the corner of the room on the floor, one was found in appellant's foot and the other had punctured the wall and was found in the closet of the next apartment, which immediately adjoined apartment 6-C.

At about this time of the evening Mr. Russell, who lived in the next apartment in which the bullet was found, heard the muffled sound of shots, and shortly afterwards heard a woman screaming and heard a man's voice say "For———Sake, shut up I am going to kill you." At about the same time the deceased, John Weer, came to their front door and fell on the doorstep where he died. Mr. Russell immediately ran for help and as he stepped over Weer's body he glanced in the direction of apartment 6-C and saw a man in a dark suit wrestling with a woman who was "hollering"—"Let me go, let me go."

When the officers arrived Weer was dead, Simone Fitch had been placed on the couch in the room in which the shooting had occurred and a tourniquet had been applied to her leg by the appellant. Fitch was standing in the room and was immediately arrested. When asked if he was the man that had done the shooting he stated "I am." As the officers were searching him and began to put handcuffs on appellant he stated: "You need not worry. I won't cause you any trouble. I have already done what I come up here to do."

Later the appellant was questioned by Coroner Dohrenwend and stated that his name was Richard Cooper Fitch, that he resided at 15035 Sutton Street, Sherman Oaks, California. He was asked what he was doing here; i. e., Las Vegas, and the coroner pointed to the deceased lying in the doorway of apartment 6-B and asked appellant: "Do you realize you have taken a man's life?" The appellant replied: "The hell with him. I accomplished my purpose. I think I killed—shot him twice." He then went on to tell about his wife's having left his home with Jack Weer and told the officers that he had three children, two who were

living with Simone Fitch at Carver Park and the third was in New York with the grandparents.

The clothing worn by the appellant, Simone Fitch and the deceased were examined closely for tears or indications of close combat, and none of the garments appeared to have been torn, nor any of the buttons wrenched off as a result of a struggle. The tattoo marks caused by powder burn on the deceased were examined closely and tests made by an experienced officer who gave his opinion as to the approximate distance from which the gun which had made the tattoo marks had been fired.

It was his opinion that the gun was some distance from the deceased when the bullet causing the chest wound was discharged, and that the gun was held at a closer range when the bullet was discharged which caused the wound in deceased's head. It was his opinion that because of the nature of Simone Fitch's wound, she was facing the appellant with her right leg directly opposite the right leg of the appellant when the bullet was fired which caused the wound to her leg, and that when the bullet was fired which caused the wound in the head of the deceased, the deceased was either in a kneeling, lying or crouching position and that Simone Fitch's arm was around deceased's neck.

The appellant made a statement some eight hours after the shooting which conflicts with the statements made to the officers and coroner.

The story of the defense conflicts with that of the state on three main issues of facts. In chronological order they are—the attitude of the appellant toward the deceased prior to coming to Las Vegas, the manner in which the shooting occurred, and the statements made by appellant after the shooting had occurred.

The testimony of the appellant was to the effect that upon finding that Simone Fitch had left him, be became extremely worried as to her whereabouts and welfare, and the welfare of his children. That when he learned she had been accompanied by John Weer, his worry was

increased, and he became frantic about her welfare, the situation in which she had placed herself and the children, and that he very much wanted his family back home.

Moved by these emotions, he threatened to kill John Weer on one occasion. He explained that the relations between him and his wife and family were not as depicted by the witness Mrs. Meunier, adding that Mrs. Meunier and his wife were very close friends and that she resented his efforts to get his wife away from the community in which Mrs. Meunier lived. He stated that Mrs. Jean Meunier had distorted the facts in disclosing the various acts of cruelty allegedly inflicted by him on his family, and he characterized these incidents as the usual family quarrels.

He testified that when he left Sherman Oaks, California, it was his intent to see Simone Fitch and John Weer and to persuade his family to return to him; he stated the gun was brought along by chance, and explained that the gun was discharged on the way to Las Vegas, not for the purpose of determining its efficiency but because the hitch-hikers had become interested in it. When he reached Carver Park he went to the desert in order to dress more properly for an interview with his wife; that he was able to locate the place in which John Weer and his wife were living by the car, and that when he first saw Simone Fitch through the window she was alone in the apartment, that immediately thereafter John Weer appeared and put his arm around Mrs. Fitch and placed his hand on her bare abdomen. That he immediately went to the door, knocked on the door and someone asked: "Who is there?" That he was afraid that Simone Fitch and John Weer would leave by a rear door so, using the gun which he was carrying in his hand as a hammer, he grasped it by the barrel, he broke the glass in the door and stepped into the room; that he was surprised because he had pictured John Weer as being a man of an altogether different appearance. There was a moment when nothing was said and then

John Weer and Simone Fitch rushed at him while he was still holding the gun in the manner he had used it for breaking the glass in the door; that a struggle for possession of the gun occurred, during which struggle the gun was discharged three times; that he did not know how he or any of the other persons were wounded; that he was afraid that John Weer would turn the gun on him; that when the firing ceased Jack Weer, who had been on the floor, got up and said that he was getting out of there; that Simone Fitch, who was lying on the floor crying, was picked up by him, placed on the couch, and he immediately applied a tourniquet and he sat down, began talking to her, and took out the letter which he had written her while in California and read it to her.

In this letter he said that he had perhaps been an unworthy husband and parent and begged that Simone Fitch forgive him and return to him; he promised that he would treat her better. The letter had the effect of reconciling the appellant and Simone Fitch, so he prepared a drink for her and they were discussing their relations when the officers arrived. He denied making the statements to the effect that he had accomplished his purpose in coming to Las Vegas; and stated that he explained to them that the shooting had occurred because John Weer had taken his wife, and that a fight resulted over the gun and that he did not know how Weer had been killed.

He admitted that when he had first met Simone Fitch she was married to J. K. Freeman and that they lived together as man and wife some eight years prior to the divorce secured by Mr. Freeman; that all of the children were born prior to the marriage of appellant and Simone Fitch in Los Angeles, California, in 1945. That they had gone through a form of ceremony in Mexico in 1935 and thereafter considered themselves man and wife, and were prevented from legalizing their relationship because of J. K. Freeman's refusal to divorce Simone Fitch.

The appellant's wife was called to testify on behalf of the appellant and corroborated his story as to what had occurred at apartment 6-C in Carver Park, and their relations since they had met. A statement admittedly made by Simone Fitch some seven or eight hours after the shooting contradicted her testimony on the witness stand.

The pertinent portions of the statement read as follows: "Around 7:00 Dick knocked on the door and nobody said anything and all of a sudden he broke through the window. Had a feeling it was him, he had a gun in his hand, he said he came to kill you to Jack. He pointed the gun at Jack, I tried to push the gun down and it seemed that Jack went around the heater and tried to get away. Dick followed him, I heard a shot, Jack fell on the floor. I tried to push Dick with his gun but he got near Jack's neck and shot, he was bleeding terrible after he was shot the first time. I went down on the floor with him and I put my leg over him and then Dick shot him in the neck. Somehow Jack managed to get up and went next door to call for help. Dick picked me up and put me on the couch the police arrived."

The testimony of Simone Fitch was also greatly impeached by a letter written to Mrs. Jean Meunier after the shooting and while the witness was in the hospital.

The appellant called two witnesses who testified that the reputation of appellant for peace and quiet was good; and the state called two witnesses who testified that the appellant's reputation for peace and quiet in the community of Sherman Oaks, California, was bad.

The appellant asserts that the evidence was insufficient to justify the conviction, but in his argument he insists that we accept his version of the facts as to what occurred before and after the shooting as being the more reasonable, and if we were to do this, and also accept his versions of the shooting the verdict could not be justified.

■ This issue cannot be determined, however, by a

choice of the more reasonable of the two theories. By the constitution, art. VI, sec. 4, this court is limited to questions of law and accordingly it is well settled that this court will not disturb a verdict although there may be a conflict such as occurs here, if there is substantial evidence to support the same. State v. Robison, 54 Nev. 56, 6 P.2d 433; State v. Beyers, 58 Nev. 125, 71 P.2d 1044; State v. Boyle, 49 Nev. 386, 248 P. 48; State v. Millain, 3 Nev. 409; State v. Mills, 12 Nev. 403.

■■ To carry the burden on such an assignment the appellant must meet his proposition and show that there is not sufficient, or any substantial, evidence to sustain the verdict, or that one element of the crime has not been proved. In considering this we have kept in mind that the jury has a right to disbelieve the defendant and accept the evidence offered by the state. State v. Soares, 53 Nev. 235, 296 P. 1081.

■ We are satisfied that there was sufficient evidence that the killing was premeditated and deliberate and with malice aforethought. The deceased had gone away with appellant's wife and it became appellant's declared design to hunt him out and kill him. In the execution of his avowed purpose, he discovered the whereabouts of deceased and his wife and arming himself with a weapon, which he tested, he sought out the deceased. He then broke into the house where the deceased was living in order to secure the advantage of surprise.

On the next proposition, namely, was the appellant able to carry his design into effect, the appellant contends first that there is not proof that he killed deceased and secondly, that if he did it was by chance and in a struggle for possession of the gun which the deceased might have turned against him.

■■ As a part of this argument the appellant points out that only two persons survived the struggle and their testimony is proof of what occurred there, that in the nature of things this testimony has not been contradicted and cannot be, and should, therefore, have

been accepted by the jury. This ignores the principle that the jury is bound only by the rules announced in the instructions of the court in determining to whom to give credibility and overlooks the fact that the testimony of both appellant and Simone Fitch was quite conclusively impeached. It assumes there was no credible evidence that the appellant killed the deceased. In determining this the jury had the right to consider not only what happened at the time of the shooting, but what occurred before and after, and statements made by the defendant both before and after the crime.

While the appellant insists that there was a terrific struggle between the three persons, the condition of their clothing does not bear him out, nor do the position and nature of the wounds. That the appellant's chief concern was in defending himself is not borne out by the testimony of the witness Russell. Nor has the appellant, in line with his theory of self-defense and struggle, explained why it was necessary or even likely that the deceased should be shot twice when either of the wounds would have disabled him from further combat. The jury had a right to disbelieve the appellant's testimony that it was not his intention to kill the deceased but to persuade his wife to return to him; that he carried the gun only for protection; that the shooting was the result of the struggle precipitated by the deceased and Simone Fitch's misunderstanding of his attitude and that that is the way he explained it to the officers when they arrived.

Assignment of error No. 2 is stated as follows: "The trial court committed prejudicial and reversible error (a) by the admission of certain evidence; and (b) by certain comments made in the presence of the jury."

The evidence of which the appellant complains became a part of the record in this manner:

The appellant on direct examination was asked when he had married Simone Fitch and answered that they married in 1935. He was then asked if there were any

children the issue of the marriage, and he replied that there were three, naming the children. On cross-examination questions were asked which elicited the additional information on the subject that appellant and Simone Fitch went through a form of marriage in Mexico in 1935, while Simone Fitch was in fact married to J. K. Freeman; that three children were born to appellant and Simone Fitch and that the parties remarried after the birth of all three children in 1945, and after a decree of divorce had been entered against Simone Fitch in 1943.

On direct examination of Simone Fitch she was asked if she was the wife of the appellant and answered in the affirmative. The state cross-examined this witness concerning her relations with the appellant and brought out the same facts elicited on cross-examination of appellant.

To the cross-examination of both witnesses on this point the appellant took exception on the grounds that it was improper cross-examination; that the evidence was immaterial as not tending to prove any of the issues of the case and now argues it was prejudicial to appellant since it put him in a bad light with the jury and prevented the jury from considering the issues impartially.

■ This court has heretofore enunciated the rule of the subject and held that the range of cross-examination should be limited to the subject matter enquired into on direct examination. Buckley v. Buckley, 12 Nev. 423; Nash v. McNamara, 30 Nev. 114, 93 P. 405, 16 L.R.A.,N.S., 168, 133 Am.St.Rep. 694; State v. Boyle, 49 Nev. 386, 248 P. 48.

In the last case this court observed that the theory justifying cross-examination is that a witness on his direct examination discloses but a part of the facts necessary to a proper evaluation of the testimony. The facts suppressed are of two kinds: "(a) The remaining and unqualified circumstances of the subject of the testimony as known by the witness; and (b) the facts

which diminish and impeach the personal trustworthiness of the witness."

It is apparent, and this court has so stated, that the extent of cross-examination attacking the personal trustworthiness of the witness must be controlled by the trial judge using his sound discretion. The cross-examiner must, however, be permitted to test the witness' motives, interests and animus and the value of his evidence for accuracy. State v. Clarke, 48 Nev. 134, 228 P. 582.

Cross-examination for this purpose must inevitably develop facts which have nothing to do with the issues of the case and tending to impeach the character or testimony of the witness, or it fails. Courts have begun to question the wisdom of permitting this sort of cross-examination along lines obviously designed to bring out facts derogatory to the witness but of no value in determining the credibility of his testimony. But if we are to settle the point in favor of appellant we would be ignoring the rule that, within the limits of the exercise of a sound discretion, this must be controlled by the court, as well as the rule which permits the cross-examiner to show any facts which show bias, interest or similar feelings which may color his testimony. We find no error.

In addition to this point the appellant, in assignment of error No. 2 takes exception to comment of the court made in the presence of the jury.

The facts on which this assignment is based are that while the witness Simone Fitch was being cross-examined she admitted authorship of a letter which was offered by the state, and over objection of appellant, admitted in evidence. Later in her testimony the same facts were disclosed concerning a second letter which the state then offered in evidence. An objection was made by appellant on the grounds of immateriality, irrelevancy, incompetency and that it was improper cross-examination. The objection was sustained with remark by the court that there was "only one sentence which

might be pertinent." The state then asked the court to consider authority to the effect that bias, relationship or interest of the witness might be shown to affect credibility. The court agreed with counsel that such was the rule and stated that there was nothing in the proffered letter which went to the credibility of the witness. The district attorney then gave his opinion that the letter showed the true feelings of the witness as contrasted with her explanation on the witness stand. The court then said: "—The first letter did, but this letter shows conclusions of what she is going to do in the future, objection sustained to this letter."

The appellant insists that this was improper comment amounting to prejudicial error, since it invaded the province of the jury by advising the jury that the first letter would impeach the witness' testimony.

In the case of State v. Lewis, 50 Nev. 212, 233, 255 P. 1002, 1009, the court had before it an assignment of this nature. The facts in that case were that during the course of the examination of a witness an objection was taken by the defendants that the evidence offered was not a part of the state's case in chief, and not in rebuttal of anything offered in defense by the defendants. In overruling the objection the court stated: "I think it is."

This court ruled that the assignment was not well taken and pointed out it was no more than a comment made to counsel assigning a reason for the ruling and that it was not intended as comment to, or an instruction for, the jury.

The general rule is that remarks made by the trial court, while ruling on the admissibility and effect of evidence and validity of the objections thereto, are not erroneous, provided they are not unfair and prejudicial to the accused. Nor is it wrong for the court to state the purpose for which evidence is offered or admitted. People v. Eley, 121 Cal.App. 53, 8 P.2d 885; Johnson v. State, 33 Ariz. 354, 264 P. 1083; State v.

Inich, 55 Mont. 1, 173 P. 230; Cole v. State, 41 Ariz. 1, 15 P.2d 238.

The fact that the comment is not addressed to the jury, nor intended for the jury, greatly reduces its asserted prejudicial effect. That is not to say that a trial judge might, under the guise of comment to counsel, comment on the evidence, as extreme caution must be exercised by him. But if it amounts to no more than a comment to counsel assigning a reason for a ruling and does not purport to invade the jury's right to pass on the facts, and is not unfair or prejudicial, there is no error. No objection was taken by counsel for the appellant, nor was the court asked to instruct the jury to disregard the remarks made by the court. We, therefore, see nothing in this assignment which would distinguish it from the case discussed above, nor any reason for now holding differently.

Assignment of error No. 3 is that the court committed prejudicial error in allowing the state to make an improper appeal to the passions of the jury in the summation of the case. More specifically, the deputy district attorney made reference to the fact that deceased was a veteran of the last war; had served his country and by so doing had given to the appellant freedom to work and provide for his family and "* * * to roam the streets without serving a day in the United States Army." Counsel for appellant interposed an objection at that point, counsel argued briefly concerning the record and the court ordered that the objection be noted and directed counsel for the state to continue his argument. An instruction to disregard the argument was not requested by appellant and no further reference was made to these facts by counsel. It appears that appellant's counsel on cross-examination of Leonard Reed brought out that the deceased was a veteran, after Leonard Reed had testified that he did not know deceased prior to his discharge from the service, on direct examination. The state on cross-examination of

appellant asked him if he had ever been in the service and received a negative answer. While, as above stated, no specific instruction was requested and refused at that time, the court did instruct that the jury could not act upon the expressions and statements of counsel nor act upon prejudice, bias or sympathy.

In a case involving similar circumstances, that is to say, the facts commented on were a part of the record, admitted without restrictions and objections taken to the comment but no instruction requested, this court held it was not prejudicial error. State v. Boyle, 49 Nev. 386, 402, 248 P. 48.

■ Citing the case of State v. Hunter, 48 Nev. 358, 232 P. 778, 235 P. 645, the court also ruled that under such circumstances it is necessary that a request be made at the time to the court to instruct the jury to disregard such remarks and unless such request is made this court will not hear the complaint. It should perhaps be added that though the court in that case stated that counsel has a right to discuss facts which are a part of the record and to draw any fair inference from them, we do not think that rule applies in this case. We do not find prejudicial error but we should be neglecting our duties if we did not express our disapproval of such conduct. We characterize such as conduct unbecoming an officer of the court. It is an obligation of counsel and more specifically counsel for the state, to refrain from taking advantage of such a circumstance, unless his argument is of aid to the jury in deciding the issues. If our criticism seems harsh, we need only to remind counsel of the consequences of such unjustifiable argument under slightly different circumstances.

Assignment of error No. 4 is that the court committed reversible error in giving instructions Nos. 9, 11 and 12 to the jury.

"Instruction No. 9

"The Court instructs the jury that, while the law requires that the killing, in order to constitute murder

in the first degree, shall be wilful, premeditated and deliberate, still it does not require that the wilful intent, premeditation or deliberation shall exist for any prescribed length of time before the crime was committed; *it is sufficient that there was a determination and, a design to kill, distinctly formed in the mind at any moment before or at the time the shot was fired.* And in this case, if the jury believes from the evidence, beyond a reasonable doubt, that the defendant shot and killed the deceased, as charged, and that at the time, or before the shot was fired, the defendant had formed in his mind, a wilful premeditated and deliberate design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design or purpose, and without any justifiable cause or legal excuse therefor, as explained in these instructions, then the jury should find the defendant guilty of murder in the first degree."

The language to which appellant takes exception is that portion of the instruction underlined above.

The appellant insists "* * * that the use of the disjunctive 'or' destroyed the validity of that essential element of the crime of murder in the first degree, that the homicide must be committed in furtherance of a design to kill." He adds that the prejudicial effect is intensified by the use of the words "* * * it is sufficient." As a practical matter it is asserted that the thought conveyed to the jury is that if they find that an intent to kill existed, at any time before the actual killing, in the mind of appellant, a verdict of first degree murder would be justified thereby ignoring the possibility that the intent to kill may have once existed but actually did not at the time the fatal shot was fired. This, it is argued, is extremely prejudicial in view of the fact that appellant had admitted an expression of an intent to kill the deceased.

■■ We do not think that the facts or authorities support the appellant's argument. It is first of all required that the instructions be read as a whole. State

v. Pritchard, 15 Nev. 74; State v. Cushing, 61 Nev. 132, 120 P.2d 208; State v. Loveless, 62 Nev. 312, 150 P.2d 1015.

Secondly, each instruction must be considered in connection with all other instructions. State v. Loveless, supra.

In observing the first rule, it is immediately apparent that the implication which appellant reads into the instruction is removed by the following language in the instruction. "If the jury believes from the evidence, beyond a reasonable doubt that the defendant shot and killed the deceased, as charged, and that at the time or before the shot was fired the defendant had formed in his mind a wilful, premeditated and deliberate design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design or purpose * * *."

By this language the jury was informed that the intent to kill must be found to exist and that the killing was perpetrated in execution of such design or intent in order to constitute murder in the first degree. This court has heretofore discussed and approved the instruction. State v. Acosta, 49 Nev. 184, 190, 242 P. 316.

Instruction No. 11 reads as follows: "It is not essential that the wilful intent, premeditation or deliberation, shall exist in the mind of the slayer for any considerable length of time before the actual perpetration of the crime. It is sufficient if there was a fixed design or determination to maliciously kill, distinctly framed in the mind of such slayer before the striking of the fatal blow or the inflicting of any other cause of death."

It is again pointed out in connection with this instruction that it ignores the requirement that the act which is fatal to the deceased must be executed in furtherance of a fixed design or determination to maliciously kill the deceased. The appellant has remarked that this instruction is a repetition of the first part of instruction 9 but has not argued on that proposition.

The instruction does omit the element that the

killing was perpetrated in execution of a fixed design, or determination, to maliciously kill distinctly framed in the mind of the slayer. The jury was instructed again and again, however, that the crime of murder in the first degree consists not only of the unlawful intent to · kill, but the actual execution of the unlawful intent by an act which produces death. We have already pointed out that this element was properly framed in Instruction 9, and in Instruction 10 the jury was instructed that any kind of wilful, deliberate and premeditated killing shall be deemed murder of the first degree. The requirement that the killing must be done in the execution of the fixed and unlawful design to kill is reiterated in instruction No. 15. Again in instruction No. 16 we find this language "* * * if a person has actually with malice aforethought formed the unlawful purpose to kill and has premeditated and deliberated upon it before he performs the act and then performs it in furtherance of said felonious design he is guilty of murder of the first degree." Language which fully stated the element appears in instruction No. 20 and in instruction No. 27. The elementary rule, that every crime or public offense must be a union or joint operation of act and intention is stated. We have already observed that all of the instructions should be read and understood in connection with each of the others, and in fact the jury was so instructed by the court.

▮▮▮ We summarize our holding on this point as follows—where, from the entire charge it clearly appears that the jury could not be misled by the language objected to, the judgment will not be disturbed. State v. Marks, 15 Nev. 33; State v. Donovan, 10 Nev. 36; State v. Raymond, 11 Nev. 98.

Appellant takes exception to given instruction No. 12 on the ground that it so misled the jury as to the law that prejudicial error resulted. The instruction given is in the exact language of section 10081, N.C.L.1929: "The killing being proved, the burden of proving circumstances of mitigation, or that justify or excuse the

homicide, will devolve upon the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed amounts only to murder in the second degree or to manslaughter, or that the accused was justified or excused in committing the homicide."

This instruction the appellant contends does not meet the requirements that an instruction must not be misleading, or confuse a jury; that it is misleading because the jury is told that the prosecution having proved the killing of the deceased, and the identity of the deceased, and the fact that the deceased's death was due to gunshot wounds, the burden of proving mitigation or justification falls on the accused. As the burden of proving mitigation or justification falls on the defendant only after the prosecution has proved that the killing was done by the accused, it is argued that it is entirely possible that the jury could have returned a verdict in this case without ever having reached the conclusion that the killing was committed by the accused.

It is obvious that the statutory manner of expressing the principle to the jury could under a different set of facts be misleading.

On the other hand, we can see no consequence of the error which would compel reversal, considering all of the circumstances of this case. In a case involving more than one defendant or the death of more than one person, or in a case in which the identity of the alleged slayer or persons involved is not certain, this instruction could conceivably so mislead the jury as to result in prejudicial error. The possibility that the jury in this case may have had in mind some other killing or some other defendant is so remote that we cannot permit it to control our holding on the point. See sec. 11266 N.C.L.1929; People v. McClure, 148 Cal. 418, 83 P. 437.

The following instruction was given by the court: "Instruction No. 37. You are instructed that the defendant is a competent witness in his own behalf, and that in considering the weight and effect to be given to

the evidence of the defendant, while you may consider his manner, and the probability of his statements taken in connection with all the evidence in the case, and if convincing and carrying with it a belief in its truth, act upon it. If not you have the right to reject it."

The instruction as offered by the appellant included this additional sentence: "And, in judging of the defendant who has testified before you, you are in duty bound to presume that he has spoken the truth and, unless that presumption has been legally repelled, his evidence is entitled to full credit." The court struck this sentence and gave the instruction. The state urges that we give some consideration to the question whether the appellant can now be heard to complain of the instruction since it was given at his request. The appellant argues in reply that the instruction, as given, was not the instruction requested. In support of his assignment of error No. 5 he contends that as the statute, section 10959, N.C.L.1929, forbidding any instruction relating exclusively to the testimony of the defendant or particularly directing the attention of the jury to defendant's testimony, statutes 1915, 191, was later in time than section 11266, N.C.L.1929, providing that no judgment shall be set aside or any new trial granted for misdirection of the jury unless, after an examination of the entire case there appears to be a miscarriage of justice or the defendant has been actually prejudiced in respect to a substantial right, section 10959 should control and that the prohibition is unqualified.

We are aware that while this instruction in varying forms was accorded judicial approval in Nevada, State v. Johnny, 29 Nev. 203, 87 P. 3, and in California, that the legislature enacted the present statute in 1915, and long before that the California supreme court reversed its previous holding and held it error to give such an instruction. That court gave as its reason the constitutional provision forbidding comment by the trial judge on the facts and the fact that the only logical purpose

the instruction could have, would be the disparagement of the defendant's testimony. People v. Van Ewan, 111 Cal. 144, 43 P. 520; People v. Boren, 139 Cal. 210, 72 P. 899. We should be inclined to consider the question from this point of view (Article VI, section 12, Nevada constitution), together with the appellant's argument, except that the point appellant now urges has been before this court before and decided adversely to the appellant. State v. Williams, 47 Nev. 279, 220 P. 555, 556.

This court, on that occassion, had this to say concerning the proposition. ˙

"It is clear that the court erred in giving the instruction. * * * But, notwithstanding the error committed, it does not necessarily follow that the judgment should be reversed, for it is expressly provided in Section 7469 of the Revised Laws * * *. It would indeed be remarkable for the Legislature to have intended, in the face of the general statute providing that no judgment should be reversed for the misdirection of the jury which resulted in no miscarriage of justice or actual prejudice to the defendant, that the giving of an erroneous instruction in the particular in question should necessarily result in a reversal of the judgment, regardless of whether the defendant was prejudiced or there was a miscarriage of justice. * * *

"Section 7160, of Rev.Laws, is a general statute meant to apply to every case in which the trial court misdirects a jury; hence the inquiry in the instant case is: Does it appear that the error complained of resulted in a miscarriage of justice, or actually prejudiced the defendant in respect to a substantial right?"

There is no escaping the conclusion that the giving of such an instruction is error and now our inquiry must be directed to whether the misdirection of the jury, after an examination of the entire case, has resulted in a miscarriage of justice, or has actually prejudiced the appellant in respect to a substantial right. We have heretofore extensively reviewed the evidence in the case

and have reached the conclusion that there was sufficient evidence to sustain the verdict. We give as a more compelling reason for holding against the appellant, that the injury which may have resulted to appellant appears remote in view of the fact that his defense did not depend entirely upon his own testimony. We are unable to assess prejudice, except on the basis that this instruction may have caused the jury to disbelieve the appellant. We cannot say that the jury disbelieved the appellant because of this instruction as we cannot conceive that his defense was tested by his testimony alone, without having in mind that the witness Simone Fitch corroborated his testimony on many crucial points."

As the sixth assignment of error is that the trial court erred in not granting a new trial and as no other assignment than those above discussed have been specified here in support of this assignment we find it unnecessary to discuss the sixth assignment.

Accordingly, the judgment, the verdict and the orders appealed from should be affirmed.

EATHER, C. J., and BADT, J., concur.

HORSEY, J., having disqualified himself, the Governor designated Hon. Taylor H. WINES, Judge of the Fourth Judicial District, to sit in his place.