LYNDEN OREN KELSO, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 10135

January 15, 1979                    588 P.2d 1035

*William N. Dunseath,* Public Defender, and *Michael B. McDonald,* Deputy Public Defender, Washoe County, for Appellant.

*Richard Bryan,* Attorney General, Carson City; *Calvin Dunlap,* District Attorney, and *John L. Conner,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

By the Court, GUNDERSON, J.:

A jury convicted Lynden Oren Kelso of first-degree murder for killing Mary Jane (Sherry) Millhouse, Lester Mitchell, and John Mitchell. At trial, Kelso did not deny shooting the victims, but claimed that in the Millhouse killing he lacked deliberate, premeditated intent requisite for first-degree murder, and that in the Mitchell killings he acted in self-defense. The court sentenced him to serve, concurrently, three life terms in prison, one with possibility and two without possibility of parole. Kelso appeals, seeking reversal on four grounds, i.e. that:

1) Jury Instruction No. 16 unconstitutionally imposed on him the burden of persuasion as to self-defense;

2) the trial court erred in not recognizing what he terms "its inherent discretion to order discovery" of certain materials;

3) the court erred by refusing a requested instruction that provoking and insulting words may negate premeditation and deliberation;

4) prosecutorial misconduct prevented a fair trial.

We affirm the convictions, finding none of the appellant's contentions require reversal.

Kelso first met Sherry Millhouse in 1974. A stormy affair ensued, contributing to Kelso's divorce from his wife. Kelso then began living with Sherry, but their relationship was erratic and Kelso moved out at least twice. Although Sherry's involvement with Lester Mitchell and her refusal to "choose" between the two men apparently occasioned Kelso's second departure, he again moved in with Sherry five days before the killings.

The day of the shootings, Kelso spent the afternoon at Lester Mitchell's trailer drinking with Sherry and her friend, Betty Rykman. Around 6:00 p.m., he drove the women to Sherry's home. After Betty departed, Kelso testified, he and Sherry continued drinking, an argument developed, and Sherry attempted to load a shotgun, which he took from her and dismantled. Betty testifed she received a phone call from Sherry around 9:00 p.m., inquiring why Betty had not followed their practice of telephoning upon safe arrival home. Betty explained she had

become engrossed in a television program, in which a murder was about to take place. Sherry replied, "there is going to be one here, too." At this point, Kelso took the phone and made small talk. Sherry then returned on the phone and said in a muffled tone, "I want to tell you what is going to happen." The phone thereupon went dead. Later that evening, officers discovered Sherry's body, with two bullet holes in the back, and a gash on the head consistent with being struck from behind with a gun. They found the phone dangling off its hook, a few feet from her body.

Kelso testified he hung up the phone when Sherry handed it to him. Then, Kelso said, the argument resumed, with Sherry bragging about her affairs with Lester Mitchell and another man. This assertedly caused him to "blow his top," and he could recall nothing until he found himself in the parking lot of a bar. There, he stated, he remembered leaving his wallet at Lester Mitchell's trailer, and decided to retrieve it.

Kelso testified that, remembering the animosity between himself and Mitchell, he tucked his pistol behind his belt before entering the Mitchell trailer. In an argument that soon followed, Lester Mitchell allegedly walked to where a rifle was kept, saying to his son John: "Let's do it." In response, John Mitchell supposedly reached for a shotgun standing in the corner. At this point, Kelso testified, he first warned the Mitchells to stop, then shot both men twice. He said he also struck Lester on the head with the butt of his pistol, because he continued reaching for the rifle.

As with the Millhouse killing, other evidence contradicted Kelso's story. The State introduced a sworn statement given by John Mitchell before death. John said Kelso came to the trailer, and sat briefly at the table before announcing: ". . . I have already shot Sherry, bumped her off with two rounds." Thereupon, Kelso pulled his pistol and shot both Mitchells twice. John played dead while Kelso struck his father, rummaged around, and finally left. John then rose, drove to a neighbor's for help, and reported the shootings. He lived three weeks; Lester Mitchell died quickly from two bullet wounds and a massive head injury.

Officers investigating the scene found no rifle there, as later alluded to by Kelso. They did find a shotgun, but it was not loaded. Contradicting Kelso's testimony that he could remember nothing of Sherry's death, the police discovered Sherry Millhouse's body because of Kelso's statements to John Mitchell before shooting him. Kelso's statement to the police following arrest also differed from his trial testimony. Specifically, in the former, he stated he was not drunk, and

remembered driving from Sherry's house toward the Mitchell trailer, rather than toward the bar he mentioned at trial.

1. Jury Instruction No. 16 recited: "[t]he burden of proving circumstances which justify or excuse the killing of another is upon the defendant, but the defendant need not prove such circumstances beyond a reasonable doubt." In objecting that this instruction violated constitutional doctrine articulated in Mullaney v. Wilbur, 421 U.S. 684 (1975), Kelso's counsel alluded only to the matter of self-defense. Thus, we consider the issue only in regard to the Mitchell killings.

In St. Pierre v. State, 92 Nev. 546, 554 P.2d 1126 (1976), considering an identical instruction, we discussed *Mullaney*'s holdings that the prosecution must prove every element of the crime charged, and that the State therefore may not compel a defendant to prove his crime is less than murder by a preponderance of evidence showing heat of passion on sudden provocation. In *St. Pierre,* we refused to extend the *Mullaney* reasoning to the defense of self-defense, before receiving further guidance; but since then, the U.S. Supreme Court has expressly declined to decide whether it denies due process to require a defendant to prove self-defense affirmatively. Hankerson v. North Carolina, 432 U.S. 233, n. 6 (1977). States may, of course, require a defendant to prove, by a preponderance of evidence, a defense that does not negate any element of the crime charged. Patterson v. New York, 432 U.S. 197 (1977). However, when the defense, by its nature, disproves a fact essential to the offense as defined by the State, the burden may not be shifted to a defendant, since doing so dilutes the State's own due process burden of proving, beyond a reasonable doubt, every element of the crime charged. *Id.* Thus, applying such authority as is available, it appears that whether a defendant may be required to prove self-defense affirmatively depends on whether such defense, if established, negates any of the elements of murder as defined in the Nevada Revised Statutes.

As so defined, murder necessarily requires a killing that is unlawful and accomplished with malice aforethought, either express or implied,[1] while for self-defense, it must appear:

1. The danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great

---

[1]NRS 200.010 defines murder as:

"the unlawful killing of a human being, with malice aforethought, either express or implied."

bodily harm, the killing of the other was absolutely necessary; . . .

2. The person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given;[2]

[3.] . . . [T]he circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears and not in a spirit of revenge.[3]

As defined, a killing in necessary self-defense is justifiable and not punishable in any manner.[4] It cannot, therefore, be considered unlawful.

Implied malice requires either absence of considerable provocation or an abandoned and malignant heart. Express malice requires the deliberate intention unlawfully to take away the life of another.[5] We believe the self-defense elements quoted above necessarily require the existence of some considerable provocation and the absence of an abandoned and malignant heart. They thus exclude any situation where implied malice exists. Likewise express malice cannot exist; for even a deliberate killing, if done in actual self-defense, is justifiable; the intent is not *unlawfully* to take the life of another.[6] Thus, since self-defense negates elements of murder, a defendant so accused in Nevada cannot be required to carry the burden of proving self-defense by a preponderance of the evidence. *See* Commonwealth v. Hilbert, 382 A.2d 724 (Pa. 1978). Instruction Number 16 does not, however, expressly impose such a

---

[2] NRS 200.200.

[3] NRS 200.130. This provision applies to all justifiable homicides.

[4] NRS 200.120 provides in pertinent part:

"Justifiable homicide is the killing of a human being in necessary self-defense. . . ."

NRS 200.190 provides:

"Justifiable and excusable homicide not punishable. The homicide appearing to be justifiable or excusable, the person indicted shall, upon his trial, be fully aquitted and discharged."

[5] NRS 200.020 states:

"1. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.

"2. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart."

[6] *See* State v. Vaughan, 22 Nev. 285 (1895), in which this court discussed intentional killing in justifiable self-defense to show error of an instruction that to constitute malice aforethought, it is only necessary intent to kill be formed.

burden. Indeed, it does not specify what degree of proof is required, except that the defendant need *not* make proof beyond a reasonable doubt.

The instruction's language apparently is derived from NRS 200.170.[7] In White v. State, 82 Nev. 304, 417 P.2d 592 (1966), we held that the language of NRS 175.235 (now 200.170), should never be used as a jury instruction in a murder case. In Phillips v. State, 86 Nev. 720, 475 P.2d 671 (1970), we reiterated that condemnation and specifically noted that the phrase, "burden of proving circumstances of mitigation," may mislead the jury into believing that the instruction imposes upon the defendant the burden of persuasion by a preponderance of the evidenc. *Id*. at 722, 723. Our criticism in *White* and *Phillips* focused particularly on the impropriety of the term "mitigation." The instruction in this case omits that term, but still imposes the "burden of proving circumstances which justify. . . ." Thus, with respect to justifiable self-defense, it retains the misleading tendency to impose the burden of proof by a preponderance on the defendant. Since an instruction expressly imposing that burden would be impermissible under the doctrine of *Mullaney,* and its progeny, we hold Instruction No. 16 to be improper where self-defense is raised by a defendant.

So far as it may be read as authorizing that particular instruction, St. Pierre v. State, *supra,* is therefore overruled.[8] However, although erroneous, the instruction does not mandate reversal since consideration of the entire case indicates neither a miscarriage of justice, nor prejudice to Kelso's substantial rights. State v. Fitch, 65 Nev. 668, 200 P.2d 991 (1948). The trial court advised the jury in three separate instructions of the prosecution's burden of proving its case beyond a reasonable doubt. As noted earlier, Kelso's story of self-defense was in total conflict with both the physical evidence and John Mitchell's statements before his death. In other respects, Kelso's version of events deviated from his own prior

---

[7]NRS 200.170 provides:

"The killing of the deceased named in the indictment or information by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified, or excused in committing the homicide."

[8]We note that in *St. Pierre,* the appellant not only failed to object, in any manner, to the instruction at trial but provided no transcript on appeal from which to determine whether it was in fact prejudicial.

statements, and circumstances ascertainable about Sherry Millhouse's death. The evidence in the record, including photographs of the death scenes, and of the gun's butt Kelso apparently damaged by beating his victims, seems consistent only with a vengeful rampage. Thus, because the jury, in any event, could not reasonably have believed Kelso's claim of self-defense, the erroneous ambiguity in Instruction No. 16 was harmless. NRS 177.255.

2. Appellant's second contention is the court erred in not recognizing its inherent discretion to order discovery of materials. However, on appeal, appellant does not assert that he was thus denied a fair trial, or prejudiced in any manner whatsoever. We therefore need not reach the merits of this issue, since for all that appears, the claimed error was harmless. *Id.*

[Headnote 10]

3. Appellant's third claim of error involves the following offered instruction, which the trial court rejected as cumulative: "You may consider the use of provoking, insulting words by a victim as creating a sudden heat of passion in the defendant which may negate premeditation and deliberation, making the crime second degree murder." Another instruction specifically stated that sudden heat of passion could negate premeditation and deliberation, and thus substantially covered the law encompassed in the offered instruction. Accordingly, the court acted properly. Beets v. State, 94 Nev. 89, 575 P.2d 591 (1978); Geary v. State, 91 Nev. 784, 544 P.2d 417 (1975).

4. Kelso finally complains that the cumulative effect of improper statements made by the prosecutor denied him a fair trial. To preserve this issue for review, objections must be made to the challenged remarks at the time, and the court must be requested to rule upon the objection, to admonish counsel, and instruct the jury. Moser v. State, 91 Nev. 809, 544 P.2d 424 (1975). Although defense counsel objected to the prosecutor arguing his case within objections, he pursued no request for a ruling. Further, counsel interposed no objections on the specific grounds here urged on appeal. Moreover, he requested no corrective admonition, and tendered no motion for mistrial. Defendant's "cumulative effects" argument, as raised for the first time on appeal, thus will not be considered.

Affirmed.

MOWBRAY, C. J., and THOMPSON, MANOUKIAN, and BATJER, JJ., concur.