7 P.3d 426 (2000)
Thomas COLLMAN, Appellant,
v.
The STATE of Nevada, Respondent.
No. 31085.
Supreme Court of Nevada.
August 23, 2000.
*430 David M. Schieck, Las Vegas, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Sudabeh Fahami, District Attorney, and Theodore J. Beutel, and Rusty D. Jardine, Chief Deputy District Attorneys, White Pine County, for Respondent.
Franny A. Forsman, Federal Public Defender, and Michael L. Pescetta, Assistant Federal Public Defender, Las Vegas, for Amicus Curiae Federal Public Defender.
Stewart L. Bell, District Attorney, and Brian S. Rutledge, Chief Deputy District Attorney, Clark County, for Amicus Curiae Clark County District Attorney's Office.
BEFORE THE COURT EN BANC.

OPINION
AGOSTI, J.:
Appellant Thomas Collman was convicted of first-degree murder and sentenced to death for killing three-year-old Damian Stach, the son of Lory Stach, Collman's livein girlfriend.
On appeal, Collman challenges various evidentiary and other rulings of the district court. None of these challenges warrant relief. Although we conclude that the jury was erroneously instructed in the guilt phase that child abuse constituted conclusive evidence of malice aforethought, we conclude that the error was harmless. We therefore affirm Collman's conviction and sentence of death.

FACTS
Damian was born to Stach and her exboyfriend, Warren Williams, on January 5, 1993. Stach was apparently a loving, affectionate mother, and Damian a happy, healthy, and energetic baby.
In September 1994, Stach moved to Las Vegas, Nevada. Stach soon met Collman, and they began dating. Shortly thereafter, Stach became pregnant with Collman's child. Stach, Collman, and two-year-old Damian then moved into a house together.
Collman and Stach decided to move to Ely, Nevada, where Collman would train for a position as a prison guard at the Ely State Prison. In order to save money, Stach, Collman, and Damian moved into the home of Collman's parents in Las Vegas. On June 3, 1995, Collman moved to Ely to begin his training, and Stach and Damian remained at the Collman residence.
Damian's brother, Darian, was born in August 1995. In October 1995, Stach, Damian, and Darian joined Collman at the Cross Timbers Trailer Park in Ely. In November 1995, Stach started noticing that Damian was losing his hair and that he bruised easily. She could not afford to take Damian to the doctor; however, she falsely told people that she had sought medical care for him and discovered that Damian had a disease. Stach's brother, Richard Stach, sent her $300.00 to take Damian to the doctor; instead, Stach spent the money on household bills and Christmas presents. Around this time, Damian became shy, withdrawn, and lethargic.
In December 1995, the family rented a house with a basement on Avenue E in Ely. The carpeted stairs to the basement did not have a railing, but had a T-shaped landing in the middle dividing the stairway into two sections of six steps each.
On January 19, 1996, Collman was home sick and slept until noon. At about 7 a.m., Stach and the children were awake, and Stach discovered that Damian had eaten a whole pack of bubble gum and some taco shells. Stach swatted Damian on his buttocks and sent him to his room. At noon, when Collman awakened, Stach told him what Damian had done that morning. Collman called Damian over to him and asked about the incident. Damian lied and said he did not eat the gum or the taco shells; therefore, *431 Collman swatted Damian for lying and sent him to his room.
Stach left the house at approximately 12:20 to 12:30 p.m. to do some errands. Collman, Damian, and Darian stayed at the house. According to Collman, he saw Damian go into the kitchen with the family dog following. He then heard Damian scream and a loud thud, like something hit a wall. Collman ran to the kitchen and looked down the stairs leading to the basement. He saw Damian lying at the bottom, crumpled up. Collman apparently attempted cardiopulmonary resuscitation (CPR) on Damian, but was unable to do so because the smell of Damian's vomit made Collman feel sick.
Collman called the office of Jamie Sullivan, where he knew Stach was completing an errand. He told Sullivan to tell Stach that Damian fell down the stairs, Damian was turning blue, and she should get her "fucking ass" home immediately. Sullivan testified that Collman sounded angry on the phone. Collman failed to call 911; rather, he put on his clothes, picked up Damian, and ran outside and toward the hospital. When Stach received the message from Sullivan, she immediately drove home where she encountered Collman running in the street with Damian in his arms. All together Stach was away from the house for approximately twenty to thirty minutes. They rushed to the hospital, arriving at 12:53 p.m., and Collman told Stach that Darian was still at home alone and she should return to pick him up.
At the hospital, the medical personnel unsuccessfully attempted for thirty minutes to resuscitate Damian, who was dead on arrival. Members of the medical staff testified that Damian was nonresponsive, bluish in color, and exhibited no signs of life when they began lifesaving procedures. They further testified that Damian was covered by overlapping bruises of various ages and possible bite marks. The bruises covered Damian's arms, legs, neck, face, head, abdomen, perineum (the area between the genitals and anus), rectum, penis, and testicles. Due to the amount, age, and areas of bruising, members of the medical staff testified that Damian's injuries were inconsistent with a fall down the stairs. Members of the medical staff testified that a story that the child fell down the stairs, the guardian's failure to call 911, the existence of overlapping bruises of varying ages, and inconsistency of the bruises with the guardian's story are all indicators of child abuse.
Dr. Ellen Clark, the medical examiner who performed the autopsy on Damian, testified that the cause of Damian's death was asphyxia leading to brain swelling, arrhythmia due to bruising around the heart, and/or multiple blunt trauma impact. She further testified that she found no bubble gum in Damian's airway. Dr. Clark explained that Damian apparently died from his body being placed in an awkward position where his knees were very forcefully and acutely bent and pulled all the way up to his chest, compressing his chest muscles. Such compression restricted Damian's breathing and disturbed the regulation of his heartbeat. This position would also leave Damian's buttocks and genital area exposed. The multiple trauma would additionally cause fat particles to break off and travel through Damian's body into his lungs and kidneys.
Dr. Clark examined and removed Damian's spinal cord and discovered that it was not injured; had it been injured, such an injury could have been consistent with a fall downstairs. Dr. Anton Sohn, Collman's medical expert, examined only photographs of the removed spinal cord. He testified that Damian died from spinal cord injury, not blunt trauma, indicating that Damian did die from falling.
Shortly after Damian's death, Stach called her brother, Richard, who immediately went to Ely with his girlfriend, Ana Flores. Collman's parents also went to Ely. On January 20, 1996, a search warrant was issued to search the house on Avenue E, requiring that Stach and Collman leave the house for a few days; during this time, they shared a motel room with Richard and Flores. Damian's funeral took place in San Mateo, California in early February 1996.
Eventually, investigations led the police to arrest Collman and charge him with murder. They also arrested Stach, charging her with child abuse and neglect causing substantial *432 bodily harm. On June 20, 1996, the State filed a notice of intent to seek the death penalty against Collman based on two aggravating factors: the murder was committed by torture, and the victim was under fourteen years of age.
On June 24, 1996, Stach pleaded guilty to child neglect causing substantial bodily harm for permitting Damian to remain with a man she knew abused him.[1] In exchange for this plea, she agreed to testify truthfully against Collman. Collman's trial commenced June 16, 1997.

Further evidence presented by the State
The State presented evidence of Collman's prior abuse of Damian, his general treatment of Damian, and his lack of remorse over Damian's death.
In January 1995, when Richard and Flores visited Collman and Stach in Las Vegas, Stach asked Collman to bathe Damian so she could wash the dishes. Collman refused, replying, "It's not my fucking kid."
In February 1995, Damian's paternal grandmother and his great aunt visited Las Vegas. They observed Collman become very agitated when Damian would cry, and Collman stated that the next time he had to watch Damian, he would throw Damian in the swimming pool and make it look like an accident.
Also in February 1995, Collman hit Damian on the buttocks with a piece of wood from a broken chair, leaving a large, dark purple bruise across both buttocks and extending down his legs. When Stach confronted Collman about the severe bruise, he instructed her to tell people that Damian fell; Stach complied. Collman testified at trial that Damian had headed for the pool, and because Damian did not know how to swim, Collman hit him with the wood to stop him.
In May 1995, Stach's friend, Monique Shaw, was at Collman and Stach's house. Damian was running down the street with the dog when Collman yelled to Damian to come back. Damian was laughing and did not respond to Collman. Collman stormed over to Damian, grabbed his shoulder, swung him around, and shook him. Collman had his hand up as if to hit Damian and brought his hand down. Shaw observed Damian jerk as if he had been hit. Damian started crying and ran to Stach.
Around the end of May 1995, shortly before Collman left for Ely, he spent a week working on a landscaping job with his friend, Michael Palombo. During this week, Collman brought Damian to the job site everyday. One day, Damian was sitting in the truck when he soiled himself. Collman was very angry and dragged Damian from the truck, held him up in the air by one of Damian's arms, and sprayed him full blast with a hose. Damian cried during this incident. On another day, Palombo noticed Collman yelling loudly at Damian and poking him hard in the chest. At one point, Collman made a fist and reached back as if to hit Damian, when Palombo yelled to Collman not to hit Damian. Collman replied, "It teaches the kid to show me respect."
Sometime between June and October 1995, Collman and his friend, Robert Marcum, were talking about disciplining their children. Marcum confided to Collman that he once spanked his son, Ian, too hard. Marcum explained that after he did it, he was very upset with himself, hugged Ian, and told Ian that he loved him. In response, Collman told Marcum that he had hit Damian too hard and left bruises.
Sometime between October 1995 and January 1996, Stach, Collman, and Damian were at the McDonald's in Ely when they saw Marcum and Ian there. Marcum testified that Damian looked pale, sickly, and blotchy; he soon realized that Damian's face was very bruised. Damian and Ian played in the Playland and returned to the adults just as Collman brought the food from the counter. In a voice loud enough to attract attention, Collman said, "Damian, where did you get those bruises?" According to Marcum, Damian had no more bruises after returning from Playland than he did before playing. Marcum found Collman's behavior strange and *433 his question to Damian contrived. Marcum was so concerned for Damian's welfare that he called Support, Inc., the town's support group service. The record does not reflect the result of Marcum's phone call.
In November 1995, Damian had diarrhea which leaked out of his diaper and ran all over himself. Stach cleaned him up and told Collman what happened. Collman stated that little boys should not do that and spanked Damian with a plastic slotted spoon on his naked buttocks three to five times.
Sometime between December 1995 and January 1996, Stach punished Damian for misbehaving by making him stand in the corner. Damian was fidgeting with his hands, so Stach told him to stop. When Damian continued to fidget, Collman used duct tape to tape Damian's hands together and to the wall high above Damian's head. When Damian started screaming hysterically, Stach made Collman let Damian loose. The incident lasted only ten to twenty seconds, and Collman testified that the tape did not stick.
In January 1996, a woman observed Collman, Stach, and Damian at a store. She noticed that Damian was very bruised and became concerned for his welfare. She said hello to Damian, who looked frightened, and told Collman that she would love to take Damian home with her. The woman testified that Collman replied in a serious tone that he would give her five dollars to take him. She also noticed Collman speak to Damian in a harsh, stern, and cold way, causing Damian to cry. The woman explained that she was unable to report this incident to the authorities because no license plate was on Collman and Stach's car.
Throughout most of the time that Collman and Stach lived together, Damian almost always had bruises; the bruising became more regular after Stach, Damian, and Darian joined Collman in Ely in October 1995.[2] Stach testified that when she would return from errands after leaving the boys with Collman, Damian would have unexplained bruises. Collman repeatedly told Stach that Damian fell and instructed her to tell people the same. Stach testified that she complied with this request because she did not want to believe that Collman was harming Damian. Stach also discovered new bruises on the evening before Damian's death.
In November 1995, Damian began losing his hair, possibly due to stress. Starting in December 1995, within a month of Damian's death, he became withdrawn, serious, sad, and less vivacious, and he stopped being affectionate with Collman.
Many witnesses testified that Collman was not upset or emotional at the hospital on January 19, 1996. Within the couple of weeks following Damian's death, Collman repeatedly stated that he thought he was going to prison. He was also very defensive when any family member would question him about what had happened and would state that the hospital must have caused all Damian's bruises. In addition, one day the family was watching videotapes of Damian, and one showed Collman giving Damian a fake punch; Collman stated that they had better not show that videotape again. Further, Collman acted angry, impatient, uncomfortable, and irritated when Stach would cry over Damian's death.
In early February 1996, while in San Mateo, California for Damian's funeral, Collman propositioned Stach for sex and complained that they had not had sex for a long time. When she refused because she was still distraught, he responded that they were still a couple.
In April 1996, when the police transported Collman from Las Vegas to Ely for questioning, he continually asked what Stach had told them and stated that "she better not have sold me out for some stupid reason."

Evidence presented by Collman
Collman presented three theories of defense: that Damian died from a fall down the stairs; that Stach, not Collman, was Damian's *434 abuser and killer; and that Damian died from choking on the bubble gum he had eaten the morning of his death.
To support his theory that Damian died from falling down the stairs, Collman presented testimony from his expert witness, Dr. Sohn, that Damian's death was the result of a spinal cord injury consistent with a fall. Further, Collman testified that when he was lying on the couch, he heard Damian scream and then a thud. Collman stated that he found Damian at the bottom of the stairs and was unable to resuscitate him with CPR. Collman claimed that he did not call 911 because he believed that the ambulance would come from McGill (a town about twelve miles outside Ely).
To support his theory that Stach had abused Damian and caused his death, Collman presented several incidents in which Stach allegedly abused Damian and was generally a bad mother, including the following.
In 1993, after Damian was born, Stach was frustrated with Damian's crying and eating habits and would have others help her care for him. She once slapped Damian's leg for being uncooperative when she was changing his diaper. One witness testified that when Damian was learning to walk and used a walker, Stach allegedly kicked the walker, sending it flying across the room until Damian smashed into the wall. Stach testified that in fact Damian was about to reach a sharp knife and out of fear she pushed away Damian's walker, which rolled to the other side of the room, tapping the wall.
In December 1994, Stach and Damian were staying in a hotel room with Flores and Richard in Santa Fe, New Mexico. Damian had been "acting up" all day and repeatedly made racial slurs about an African-American man who was walking outside the hotel window. Stach told him to stop, but he continued to repeat the epithet. Stach slapped Damian across the face with the back of her hand; Stach's ring cut Damian's lip, which started bleeding. Stach testified that she felt very bad about this incident and had not intended to injure Damian as she had.
In October 1995, Stach brought Damian over to Rick and Kim Colon's house. Rick Colon was Collman's friend from prison guard training. Stach pulled down Damian's pants to show them his bruises and proudly announced, "That's what bad boys get at my house." Stach suggested to the Colons that they discipline their children the same way. Rick Colon testified that he felt uncomfortable around Stach and felt concerned for Damian's welfare. However, he did not call the authorities on Damian's behalf.
On Halloween 1995, Stach, Kim Colon, Shelley Muir, and their children went trick-or-treating. Damian was costumed as a football player, and Muir commented on Damian's authentic black-eye makeup. Stach allegedly replied in a serious tone, "What makeup? The little bastard did something wrong today, and I had to reprimand him." Further, after the children got tired of walking, both Muir and Kim Colon picked up their children and carried them home, while Stach made Damian walk the whole way, calling him lazy when he would fall down.
Sometime after Halloween 1995, when Kim Colon was at Stach's residence, Damian turned on the propane gas tank for the stove. Stach, who was about to light a cigarette, saw what Damian did and punished him by hitting his naked buttocks with a spatula, causing a bruise. Stach testified that she punished him severely only because his action caused her great fear; if she had lit her cigarette, the house could have blown up from the propane.
Shortly after the spatula incident, Stach and Damian visited the Colons' house, when their son, Christopher, and Damian started to turn on the propane gas tank on the stove. Kim Colon testified that Stach punished Damian by hitting his hands with a wooden spoon fifteen to twenty times, and Kim Colon did not hit Christopher. Stach testified that Kim Colon punished Christopher by hitting his hands a couple of times with a wooden spoon, and therefore, Stach did the same to Damian because she believed that the punishments should be equal.
In December 1995, Damian was standing near Stach, who was smoking a cigarette. Stach bent over to pick up a puppy and accidentally burned Damian in the forehead with the cigarette. Stach would also trip *435 Damian with a child's hockey stick as he walked by her. She testified that this was done playfully and not intended to hurt Damian.
In support of his third theory, that Damian died from choking on bubble gum, Collman testified that Damian had eaten a whole pack of gum the morning of his death. At the hospital, Collman had suggested to the medical personnel that Damian may have choked on the gum. Further, members of the medical staff testified on cross-examination that they had difficulty putting an endotracheal tube down Damian's throat, indicating a blockage. This evidence was impeached by testimony that the blockage was mucous, which very commonly forms in the throat of abused children due to crying. Additionally, Dr. Clark testified that during the autopsy, she found no gum in Damian's throat. She further stated that had the gum lodged in Damian's throat at 7 a.m., when he ate the gum, he would have choked right away and not five and a half hours later.

Collman's conviction and sentence
On July 9, 1997, the jury returned a guilty verdict of first-degree murder against Collman. At the conclusion of the penalty phase, the jury found two aggravating factors: torture and victim under fourteen years old. The jury also found six mitigating circumstances: no significant criminal history; job history; cooperation with law enforcement; lighter sentence for Stach; lack of intent to kill; and no flight of any kind. After determining that the mitigating circumstances did not outweigh the aggravating circumstances, the jury sentenced Collman to death.
On September 8, 1997, the district court sentenced Collman to death and sentenced Stach to a term of eight to twenty years in prison. Collman's judgment of conviction and notice of appeal were filed that same day.

DISCUSSION

I. Denial of motions to excuse two potential jurors for cause

Collman contends that the district court erred by failing to excuse two potential jurors for cause. Both had read about the case in the newspaper and had heard others talk about it. Collman eventually removed one by peremptory challenge, but the other served on the jury.
NRS 175.036(1) permits either party to challenge an individual juror for cause if she could not adjudicate the facts fairly. NRS 16.050(1) lists grounds upon which a juror may be dismissed for cause, including:
(f) Having formed or expressed an unqualified opinion or belief as to the merits of the action, or the main question involved therein; but the reading of newspaper accounts of the subject matter before the court shall not disqualify a juror either for bias or opinion.
(g) The existence of a state of mind in the juror evincing enmity against or bias to either party.
In this case the district court questioned both potential jurors closely, and both consistently informed the court that they could be fair and impartial. The court determined that neither had formed any opinion or had any bias against Collman. We conclude that the court did not err in refusing to excuse either potential juror for cause. Cf. Thompson v. State, 111 Nev. 439, 441-43, 894 P.2d 375, 376-77 (1995); Bryant v. State, 72 Nev. 330, 332-35, 305 P.2d 360, 361-62 (1956).

II. Evidence of other acts by a state witness

Collman attempted to introduce evidence of other acts by Stach to impeach her credibility or to show that she was responsible for Damian's death. The evidence fell into three types. The district court did not admit any of the evidence, and Collman asserts that in each case the court erred.
NRS 48.045(2) prohibits the admission of evidence of other crimes, wrongs, or acts to prove a person's character, but such evidence may be admissible for other purposes. In order to determine admissibility of those acts, the district court must determine that "(1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *436 Tinch v. State, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997). The decision to admit or exclude evidence rests within the trial court's discretion, and this court will not overturn that decision absent manifest error. Daly v. State, 99 Nev. 564, 567, 665 P.2d 798, 801 (1983).

The witness's alleged interest in vampirism, biting, and devil worship
On October 24, 1996, Collman moved the district court to admit evidence that Stach allegedly had an interest in vampirism, biting, and devil worship in order to prove that she, and not Collman, had abused Damian resulting in his death. After an evidentiary hearing, the district court denied Collman's motion. Using a less stringent standard than when the State requests admission of prior acts by the defendant,[3] the district court concluded that the probative value of the evidence was substantially outweighed by the danger of confusing the issues and misleading the jury. See NRS 48.035(1). After a review of the evidence that Collman requested be admitted, we conclude that the district court did not abuse its discretion by excluding it.

The witness's abortion
During Stach's testimony on direct examination that she did not work and stayed home with the kids, she stated that she loved being pregnant. Prior to cross-examination and outside the jury's presence, the defense requested permission to impeach Stach's statement by questioning her about an abortion she had previously undergone. The district court conducted the requisite balancing test pursuant to NRS 48.035(1) between probative value and danger of unfair prejudice. The court concluded that the information about Stach's abortion was a collateral matter and the minimal value of it was "overwhelmingly outweighed" by the danger of unfair prejudice, confusing the issues, and misleading the jury.
Collman contends that the district court abused its discretion and permitted Stach to "lie with impunity" about her feelings toward pregnancy. We disagree.
NRS 50.085(3) permits impeaching a witness on cross-examination with questions about specific acts as long as the impeachment pertains to truthfulness or untruthfulness and no extrinsic evidence is used. Impeachment on a collateral matter is not allowed. McKee v. State, 112 Nev. 642, 647, 917 P.2d 940, 943 (1996).
The district court was correct that whether or not Stach once had an abortion is collateral to the issue of who killed Damian. It was also correct that any probative value the evidence might have was substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. We conclude that the district court did not abuse its discretion in disallowing impeachment on this question.

The witness's alleged lack of remorse over the victim's death
The State presented evidence of Collman's lack of remorse through testimony that Collman propositioned Stach for sexual relations around the time of Damian's funeral. Stach testified that she had refused Collman's advances because she was too emotionally distraught over Damian's death. In response, the defense wanted to present evidence of Stach's lack of remorse through her alleged sexual conduct shortly after Damian's death. Specifically, the defense wanted to present evidence that Stach had allegedly propositioned Kim Colon for sex and had allegedly had a sexual affair with Ana Flores. The district court conducted an evidentiary hearing to determine whether these prior acts were admissible.
*437 At the evidentiary hearing, Collman's parents each testified as to an alleged incident occurring between Flores and Stach on January 21, 1996. Further, Kim Colon testified that while Stach was temporarily living with her in February 1996, Stach propositioned her. The district court denied Collman's motion, concluding that the information was irrelevant, prejudicial, and incredible.
Collman argues that the district court abused its discretion by excluding this evidence. See Daly, 99 Nev. at 567, 665 P.2d at 801 (holding that the trial court has the discretion to admit or exclude evidence). We conclude that evidence regarding Stach's lack of remorse was relevant to Collman's defense that Stach was the real killer. Because the district court admitted evidence that Collman lacked remorse over Damian's death, Stach's lack of remorse was equally relevant. Therefore, the district court incorrectly concluded that the evidence was irrelevant.
Nevertheless, our review of the record reveals that Collman's allegation of Stach's sexual conduct was not proven by even a preponderance of the evidence, let alone clear and convincing evidence. The record reflects that the testimony of Collman's parents was inconsistent and implausible and that Kim Colon had animosity toward Stach. Kim Colon further admitted that she had previously lied to a police officer who interviewed her and that she would lie to protect herself. Accordingly, the district court did not abuse its discretion by excluding such evidence.

III. Evidence of other acts by appellant

Collman claims that evidence that he had been transferred at work was improperly admitted as character evidence. To reiterate, in order to admit evidence of a person's other crimes, wrongs, or acts, the district court must determine that the other act is relevant for an admissible purpose, that it was proven by clear and convincing evidence, and that the probative value of the act is not substantially outweighed by unfair prejudice. NRS 48.045(2); Tinch, 113 Nev. at 1176, 946 P.2d at 1064-65. This court will not overturn a district court's decision to admit or exclude evidence absent an abuse of discretion. Daly, 99 Nev. at 567, 665 P.2d at 801.
The State presented testimony that in December 1995, Collman felt stress from working in the lockdown unit of the prison, Unit 2, a difficult and dangerous section also known as "the prison within the prison." Collman mentioned to a coworker that he also felt stress at home because Damian was "getting into things," was out of control, and did not listen to Collman. For his benefit, Collman transferred to a less stressful unit for two weeks before returning to his original post in Unit 2.
Prior to admitting this testimony, the district court conducted an evidentiary hearing and determined that the temporary transfer was relevant to show that Collman was under stress shortly before Damian's death. The court also determined that the probative value of the evidence of the nondisciplinary transfer was not substantially outweighed by the danger of unfair prejudice.
We conclude that based on the district court's reasoning and the record as a whole, the court did not abuse its discretion.

IV. Evidence that appellant had been in jail

Collman argues that the district court erred by denying his motion for a mistrial based on references made to his being in jail. Reference to a defendant's prior criminal history may be reversible error. See Witherow v. State, 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1988). The test for determining if such a reference occurred is whether the jury could reasonably infer from the evidence presented that the defendant had engaged in prior criminal activity. Id.
During the prosecutor's direct examination of Collman's friend, Robert Marcum, the following exchange took place.
Q. Now, do you recalldo you remember when that happened when you went to pick up this mattress?
A. Hum, it was actually the sameI guess he was in jail down in Las Vegas. And it was supposedly he was getting out of jail that day.

*438 Q..... Do you remember how long after [Damian's death] that could have happened?
A. Not exactly. That's the best way I can.
Additionally, during defense counsel's cross-examination of another of Collman's friends, Michael Palombo, Palombo also mistakenly and briefly revealed that Collman was in jail.
Shortly thereafter, outside the jury's presence, Marcum testified that although the prosecutor had specifically instructed him not to, he mistakenly revealed that Collman was in a Las Vegas jail in approximately February 1996. (The record does not divulge why Collman was in jail.) Marcum stated, "It just came out. I justyou know, I wasn't thinking about it." At the conclusion of this hearing, Collman moved for a mistrial. The district court denied the motion, stating that the slips were inadvertent, Marcum and Palombo did not disclose why Collman was in jail, and the jury could easily think that Collman was in jail due to the present matter.
After reviewing the references made and the hearing afterward, we conclude that the remarks improperly referred to Collman's prior criminal history but were harmless. Thus, the district court did not err in denying the motion for a mistrial. Palombo's and Marcum's statements that Collman was in jail were not made or elicited by the prosecutor; they were brief, inadvertent comments made by inexperienced witnesses in the midst of a long and complicated trial. Additionally, Marcum stated that "he" was in jail and did not use Collman's name. While the jury may have realized that "he" was Collman, that fact was not emphasized. Moreover, in the penalty phase, the jury found as a mitigating factor Collman's lack of a criminal history. We are convinced, therefore, that Collman was not prejudiced by the witnesses' remarks.

V. The videotape of the victim when he was a healthy baby

Richard Stach testified as to Damian's demeanor prior to Collman's involvement in Damian's life. During this testimony, the State sought admission of a videotape depicting Damian as a happy baby with no bruises. The district court conducted a hearing and viewed the videotape. The court concluded that because the videotape's quality was deficient, it could not be used to demonstrate Damian's lack of bruises. However, the court determined that the probative value of establishing Damian's demeanor was not substantially outweighed by the danger of unfair prejudice or emotional appeal to the jury. Accordingly, over Collman's objection, the court admitted the videotape for that limited purpose.
Collman contends that the videotape had no probative value and only served to appeal to the jurors' emotions. The trial court has the discretion to admit or exclude photographs of a victim, and this court will not overturn such a ruling absent an abuse of that discretion. Browne v. State, 113 Nev. 305, 314, 933 P.2d 187, 192 (1997). The court must determine whether the probative value is substantially outweighed by the danger of unfair prejudice. Id. at 313 n. 1, 933 P.2d at 192 n. 1. Here, the district court reviewed the videotape and determined that it was relevant and probative. We conclude that Collman failed to demonstrate that the district court abused its discretion.

VI. Report by the state's expert regarding bite marks on the victim's body

Collman contends that the district court erroneously admitted a report made by the state's forensic expert.
Dr. Raymond D. Rawson, the state's expert witness, prepared a forensic report, Exhibit 96, concluding that Damian suffered nine separate bite marks and with "a high degree of confidence" that Collman was the biter. Dr. Rawson testified to this opinion at trial. The defense utilized the report to cross-examine Dr. Rawson and even showed a photograph in the report to the jury. Based on this use of the report by Collman, the State asked that the whole report be admitted. The defense objected, arguing that Dr. Rawson had not testified to all portions of the report. Specifically, Dr. Rawson's report referred to nine bite marks on Damian's body, while Dr. Rawson's testimony focused *439 on only three of the most severe and obvious bites. The district court admitted the report into evidence.
Collman argues that the district court erroneously admitted the entire report. We conclude that this argument has no merit pursuant to NRS 47.120(1), which provides: "When any part of a writing or recorded statement is introduced by a party, he may be required at that time to introduce any other part of it which is relevant to the part introduced, and any party may introduce any other relevant parts." See also Domingues v. State, 112 Nev. 683, 693-94, 917 P.2d 1364, 1372 (1996).
Here, Collman in effect introduced portions of the report during cross-examination of Dr. Rawson. Under NRS 47.120(1), the State was permitted to introduce any other relevant parts. The entire report was relevant to the case because evidence of bite marks tended to prove that Damian was an abused child. Further, Dr. Rawson's testimony referred to his overall conclusion that nine bite marks were present and that Collman caused them all; therefore, contrary to Collman's contention, the entire report contained information to which Dr. Rawson testified. We conclude that the district court did not err in admitting the report.

VII. Defense evidence regarding bite marks on the victim's body

The State presented evidence that Damian had several bite marks on his body. While one mark on his forearm was indisputably a bite mark, the parties vigorously litigated whether the other marks were bites, Dr. Norman Sperber was one of three defense experts in forensic dentistry. All three experts agreed that Damian had one bite mark on his arm, but ruled out the other marks as bites. Outside the presence of the jury, Dr. Sperber testified that he became involved with this case while at a conference attended by law enforcement agents and other forensic dentists. One of the police officers assigned to the instant case showed Dr. Sperber Damian's photographs and a report written by the state's forensic dentist expert. Dr. Sperber showed the photographs and/or portions of the report to his colleagues at the conference. Those colleagues apparently opined based solely on the photographs that Damian possessed only one bite mark on his forearm. Collman moved the district court to permit Dr. Sperber to testify to his colleagues' statements. The district court denied the motion because the statements were not reliable.
Arguing that the district court erred by excluding the statements, Collman cites NRS 51.075(1) and Emmons v. State, 107 Nev. 53, 807 P.2d 718 (1991). NRS 51.075(1) provides: "A statement is not excluded by the hearsay rule if its nature and the special circumstances under which it was made offer assurances of accuracy not likely to be enhanced by calling the declarant as a witness, even though he is available." In Emmons, the district court permitted the testifying medical examiner to discuss the concurring opinion of her colleague, a radiologist, regarding certain medical evidence. Additionally, the court admitted a letter written by the radiologist outlining his opinion. Emmons, 107 Nev. at 57, 807 P.2d at 720. This court concluded that the trial court did not err by admitting the testimony and letter pursuant to NRS 51.075 because the radiologist was a disinterested witness with no motive to lie. Id. at 57, 807 P.2d at 721.
Collman argues that this case is like Emmons because the doctors at the conference were disinterested witnesses with no motive to lie; therefore, "assurances of accuracy" exist. We conclude that while Dr. Sperber's colleagues may have been disinterested with no motive to lie, the requisite assurances of accuracy are not as strong as those in Emmons. Specifically, the radiologist in Emmons wrote a letter discussing the medical evidence and why he agreed with the medical examiner. It also appears that the two doctors consulted extensively. By contrast, in the present case, Dr. Sperber only showed his colleagues photographs of Damian's body. They did not possess molds of Collman's, Stach's, and Damian's teeth, they did not read reports by the state's expert, and they did not view Damian's body. Further, each colleague apparently looked over the photographs for only a few minutes each in between seminars at the conference. Accordingly, *440 because calling those colleagues to the stand was the only way to test the accuracy of their hearsay statements, we conclude that Dr. Sperber's proposed testimony of his colleagues' opinions does not fall within the exception in NRS 51.075.[4] Therefore, we conclude that the district court did not err in excluding that testimony.

VIII. Impeachment of a defense witness

Rick Colon testified for the defense that Stach proudly displayed bruises she allegedly inflicted on Damian. He testified that due to Stach's behavior, he was concerned for Damian's welfare. On cross-examination, the State asked whether he had called the authorities to report Stach as a child abuser. The defense objected, arguing that failure to call the authorities is not proper impeachment. The district court overruled the objection, permitting Rick Colon to answer. Rick Colon testified that he did not call the authorities to report Stach and that he also refused to speak with the police or prosecutors about this case because he preferred to "keep them in the dark."
Collman argues that the State improperly impeached Rick Colon. Collman cites only to two New York cases which hold that a prosecutor may not impeach an alibi witness based on the witness's failure to inform the police of the alibi and that no inference may be drawn from such failure. See People v. Allen, 74 A.D.2d 640, 425 N.Y.S.2d 144, 148 (N.Y.App.Div.1980), overruled by People v. Knight, 173 A.D.2d 736, 570 N.Y.S.2d 617 (N.Y.App.Div.1991); People v. Hamlin, 58 A.D.2d 631, 395 N.Y.S.2d 679, 681 (N.Y.App.Div.1977). These cases are inapplicable in the present matter.
Impeachment consists of attacking a witness's credibility, which depends on that witness's willingness and ability to tell the truth. 1 John William Strong, McCormick on Evidence § 33 (4th ed.1992). One may be impeached with respect to such matters as perception, memory, communication, sincerity, or bias. Id. Here, the State attempted to prove that Stach was not Damian's abuser. In asking whether Rick Colon called the authorities, the State impeached the sincerity of his alleged concern for Damian. Further, the fact that Rick Colon preferred not to talk to police or prosecutors suggested a bias for the defense. Accordingly, we conclude that the State properly impeached Rick Colon.

IX. Proposed jury instruction on child abuse causing substantial bodily harm, a felony

During the settling of the jury instructions, Collman requested an instruction on child abuse causing substantial bodily harm, a felony, but the district court refused to give the instruction. Collman contends that the court erred.
In Moore v. State, 105 Nev. 378, 383, 776 P.2d 1235, 1239 (1989), this court held that the trial court must give a defendant's proffered jury instruction on a lesser related offense if three conditions are satisfied: "(1) the lesser offense is closely related to the offense charged; (2) defendant's theory of defense is consistent with a conviction for the related offense; and (3) evidence of the lesser offense exists."[5] Here, child abuse causing *441 substantial bodily harm is closely related to first-degree murder from child abuse and is supported by evidence presented by the State. We conclude, however, that the second condition is not satisfied.
In Moore v. State, 109 Nev. 445, 446-47, 851 P.2d 1062, 1063 (1993), the jury was instructed on a lesser related offense at the state's request and convicted the defendant of the lesser related offense. This court reversed the conviction because the lesser related offense was inconsistent with the defendant's theory of defense, a complete denial of culpability. This court concluded that the defendant must admit to some conduct which constitutes the lesser crime before the jury may be instructed on the lesser related offense. Id. at 447, 851 P.2d at 1063; see Johnson v. State, 111 Nev. 1210, 1213-14, 902 P.2d 48, 50 (1995).
Collman contends that admitting "to some conduct which constitutes the lesser crime" violates his Fifth Amendment right against self-incrimination. Accordingly, he argues that he should not have to admit to any action which caused Damian substantial bodily harm to get the lesser related offense instruction. This argument clearly lacks merit. Collman was not compelled to admit to criminal conduct. He was merely required to demonstrate that his theory of defense was consistent with his proposed instruction. He had no right to an instruction which was inconsistent with his "complete denial of culpability." Again, all of Collman's defense theories consisted of denying any wrongful action on his part. He asserted that Damian fell down the stairs, choked on bubble gum, or died from Stach's abuse. None of these defenses are consistent with Collman's claim of inflicting substantial bodily harm upon Damian on January 19, 1996.
The district court therefore did not err by refusing to give the requested instruction.

X. Sufficiency of the evidence to support the conviction

Collman contends that the evidence was insufficient to support his conviction. We reject this contention.
In reviewing the evidence supporting a jury's verdict, this court must determine whether the jury, acting reasonably, could have been convinced of the defendant's guilt beyond a reasonable doubt by the competent evidence. Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980). This court will not disturb a jury's verdict on appeal where there is substantial evidence to support it. Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981). The jury determines what weight and credibility to give conflicting testimony. Id. Circumstantial evidence alone may support a judgment of conviction. Deveroux v. State, 96 Nev. 388, 391, 610 P.2d 722, 724 (1980).
Collman asserts that Stach lied on the stand and that the evidence was just as strong that Stach caused the fatal injuries, not he, or that Damian had died as a result of a fall down the stairs. Collman seeks to reargue the credibility of the witnesses, particularly Stach's. The jury, however, already determined credibility in the state's favor. Also, sufficient evidence existed to convince the jury beyond a reasonable doubt that Damian's death was not caused by an accidental fall.

XI. The jury instruction that child abuse constituted conclusive evidence of malice aforethought

During the guilt phase, the jury received instruction number 11, which read:
There are certain kinds of murder which carry with them conclusive evidence of malice aforethought. One of these classes of murder is murder committed by means of child abuse. Therefore, a killing which is committed by child abuse is deemed to be murder of the first degree, whether the killing was intentional or unintentional.
(Emphasis added.)
Collman did not challenge this instruction below or on appeal, but after reviewing the record, we ordered the parties to provide supplemental briefs addressing whether this instruction correctly provided that child *442 abuse constituted conclusive evidence of malice when murder is charged pursuant to NRS 200.030(1)(a). Having considered the supplemental briefs of the parties and of amici curiae, we conclude that instruction number 11 was erroneous, but we conclude that the error was harmless beyond a reasonable doubt in light of the other proper instructions provided to the jury, the jury's verdicts as a whole, and the evidence in this case.[6]

The types of malice and of murder
In Nevada, consistent with the common law, murder "is the unlawful killing of a human being, with malice aforethought, either express or implied."[7] NRS 200.010; see Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 7.1, at 605-06 (2d ed.1986); Model Penal Code and Commentaries § 210.2 cmt. 1 at 13-15 (Official Draft and Revised Comments 1980). Today, the phrase "malice aforethought"
does not even approximate its literal meaning. Hence it is preferable not to rely upon that misleading expression for an understanding of murder but rather to consider the various types of murder (typed according to the mental element) which the common law came to recognize and which exist today in most jurisdictions: (1) intent-to-kill murder; (2) intent-to-do-serious-bodily-injury murder; (3) depraved-heart murder; and (4) felony murder.
LaFave & Scott, Criminal Law § 7.1, at 605. Originally, in addition to an intent to kill, malice included "perhaps an element of hatred, spite or ill-will," though this element is not actually necessary. Id. A cold-blooded murderer could kill a kidnap victim, for example, simply for the sake of convenience, Nevertheless, as demonstrated below, consistent with its ordinary connotation, malice of all four types includes an intent to act wrongfully.
Nevada expressly recognizes three of these malicious states of mind in its statutes and case law.[8] NRS 200.020 defines express malice as the "deliberate intention unlawfully to take away" another's life and implied malice as "an abandoned and malignant heart." These forms of malice are, respectively, the mental elements for intent-to-kill murder and depraved-heart murder. Nevada statutes and this court have apparently never employed the phrase "depraved heart," but that phrase and "abandoned and malignant heart" both refer to the same "essential concept ... one of extreme recklessness regarding homicidal risk." Model Penal Code § 210.2 cmt. 1 at 15; see also Thedford v. Sheriff 86 Nev. 741, 744, 476 P.2d 25, 27 (1970) (malice as applied to murder includes "general malignant recklessness of others' lives and safety or disregard of social duty"). NRS 200.030(1)(b) defines felony murder, in which "[t]he felonious intent involved in the underlying felony may be transferred to supply the malice necessary to characterize the death a murder." Ford v. State, 99 Nev. 209, 215, 660 P.2d 992, 995 (1983). Instruction number 11 was patterned after the felony-murder instruction approved of in Ford. See id. at 214, 660 P.2d at 995.
Nevada defines by statute three kinds of first-degree murder.[9]
Murder of the first degree is murder which is:
(a) Perpetrated by means of poison, lying in wait, torture or child abuse, or by any other kind of willful, deliberate and premeditated killing;
(b) Committed in the perpetration or attempted perpetration of sexual assault, kidnaping, arson, robbery, burglary, invasion *443 of the home, sexual abuse of a child or sexual molestation of a child under the age of 14 years; or
(c) Committed to avoid or prevent the lawful arrest of any person by a peace officer or to effect the escape of any person from legal custody.
NRS 200.030(1).
The issue presented in this case is: for first-degree murder under subsection (1)(a) of NRS 200.030, can malice be established simply by proving that the killing was done by an enumerated means? The State answers this question affirmatively, offering three or four arguments in support of its position. We conclude that none has merit.

Malice versus willfulness, deliberation, and premeditation
First, the State asserts that: (1) the means enumerated in NRS 200.030(1)(a) constitute willfulness, deliberation, and premeditation as a matter of law, and (2) willfulness, deliberation, and premeditation subsume malice aforethought as a matter of law. Thus, the State contends, the child abuse in this case established willfulness, deliberation, and premeditation which in turn established malice. We reject both prongs of the state's argument.
The means enumerated in subsection (1)(a) do not necessarily constitute willfulness, deliberation, and premeditation, though there is authority for construing the statute in this manner. See Graham v. State, 116 Nev. ____, 992 P.2d 255 (2000). The original enumerated means are poison, lying in wait, and torture, whereas child abuse was added to subsection (1)(a) only recently.[10] Although the three traditional enumerated means are normally consistent with deliberate, premeditated action, cf. LaFave & Scott, Criminal Law § 7.1, at 605, child abuse can be and often is a rash, impulsive crime. It is unnecessary to analyze murder by means of child abuse in terms of deliberation and premeditation because the soundest view is simply that a murder perpetrated by an enumerated means is first-degree murder by force of statute, without legal concern with or factual inquiry into willfulness, deliberation, and premeditation. See Graham, 116 Nev. at ____, 992 P.2d at 257-58; State v. Johnson, 317 N.C. 193, 344 S.E.2d 775, 781 (1986); People v. Thomas, 41 Cal.2d 470, 261 P.2d 1, 3 (1953).
The second prong of the state's argument contains a more pronounced flaw because malice is not subsumed by willfulness, deliberation, and premeditation. This court has so stated, but without much explanation. See, e.g., Hern v. State, 97 Nev. 529, 532, 635 P.2d 278, 280 (1981). But the proposition can be easily illustrated. For example, it is possible for a police sniper to act willfully, deliberately, and premeditatedly but without malice in fatally shooting a man who has taken hostages and threatens their lives. The legal defense of defense of self or others justifies a homicide and negates the element of malice. "[E]ven a deliberate killing, if done in actual self-defense, is justifiable; the intent is not unlawfully to take the life of another." Kelso v. State, 95 Nev. 37, 42, 588 P.2d 1035, 1039 (1979); see also State v. Vaughan, 22 Nev. 285, 299-302, 39 P. 733, 735-36 (1895).

Malice versus specific intent to kill
As a second argument, the State repeatedly invokes and cites authority for the proposition that specific intent to kill is not a necessary element of murder. This proposition, however, does not address this court's concern with jury instruction number 11. The instruction stated that "murder committed by means of child abuse" is a kind of murder which carries with it "conclusive evidence of malice aforethought." (Emphasis added.) Specific intent to kill is not synonymous with malice. The fact that not every *444 murder requires a specific intent to kill does not relieve the State of the burden to prove some kind of malice to establish murder.[11]
As the West Virginia Supreme Court of Appeals explained, "the language `murder by poison, lying in wait, imprisonment, starving' does not require that premeditation or a specific intent to kill has to be shown, but to elevate the homicide to first-degree murder, a killing with malice must be proved and one of the four enumerated acts must be established." State v. Harper, 179 W.Va. 24, 365 S.E.2d 69, 72 (1987); see also People v. Benjamin, 52 Cal.App.3d 63, 124 Cal.Rptr. 799, 813 (1975).

First-degree murder by an enumerated means versus first-degree felony murder
The State analogizes murder under NRS 200.030(1)(a) to felony murder under subsection (1)(b). In the latter case, by law the malice required for murder is supplied by the intent to commit an enumerated felony. Likewise, the State argues, the requisite malice arises as a matter of law from the use of an enumerated means under subsection (1)(a). However, this and other courts have never followed the view urged by the State (we discuss exceptional cases treating murder by torture below).
The California Supreme Court explained this matter clearly in People v. Mattison, 4 Cal.3d 177, 93 Cal.Rptr. 185, 481 P.2d 193, 196 (1971).
Thus if a killing is murder within the meaning of sections 187 [defining murder as an unlawful killing with malice aforethought] and 188 [defining express and implied malice], and is by one of the means enumerated in section 189 [i.e., poison, lying in wait, or torture], the use of such means makes the killing first degree murder as a matter of law. It must be emphasized, however, that a killing by one of the means enumerated in the statute is not murder of the first degree unless it is first established that it is murder. If the killing was not murder, it cannot be first degree murder, and a killing cannot become murder in the absence of malice aforethought. Without a showing of malice, it is immaterial that the killing was perpetrated by one of the means enumerated in the statute.
It is true that murder may be committed without express malice, i.e., without a specific intent to take human life. To be so committed, however, unless the felony-murder rule is applicable, "the defendant must intend to commit acts that are likely to cause death and that show a conscious disregard for human life." [Thomas, 261 P.2d at 7 (Traynor, J., concurring).] ...
The above rules apply to all murders, other than felony murders, regardless of whether they are committed by one of the means enumerated in section 189.
See also Harper, 365 S.E.2d at 72 (quoted above); Benjamin, 124 Cal.Rptr. at 813 (cited above); cf. State v. Johnson, 821 P.2d 1150, 1156-57 (Utah 1991) (first-degree murder first requires proof of what would otherwise be second-degree murder and then proof of an enumerated aggravating factor, e.g., administering poison).
This court's case law is in accord with Mattison. That malice is required to find murder by an enumerated means was implicit to this court's reasoning in Pinana v. State, 76 Nev. 274, 286, 352 P.2d 824, 831 (1960). In that case, the court upheld the giving of a jury instruction which stated: "All murder which is perpetrated by means of lying in wait is murder of the first degree." Id.
Appellant contends that this instruction was defective because the court failed to explain that murder must first be established before the question of lying in wait can arise. In the other instructions given the court defined murder and stated that to find appellant guilty thereof all of the elements must have been proven beyond a reasonable doubt.... [T]his instruction *445 was proper to aid the jury in determining the degree of the offense in the event they found the appellant guilty of murder.
Id. (emphasis added). The court accepted the appellant's premise that "murder must first be established before the question of lying in wait can arise." In Moser v. State, 91 Nev. 809, 812 & n. 3, 544 P.2d 424, 426 & n. 3 (1975), the appellant challenged an instruction which read, "The unlawful killing of a human being, with malice aforethought, with express or implied intent, which is committed by a person lying in wait for his victim, is Murder in the First Degree." (Emphasis added.) This court held that the instruction was properly given and quoted People v. Atchley, 53 Cal.2d 160, 346 P.2d 764, 772 (1959), for the proposition that the elements constituting lying in wait "'are watching, waiting, and concealment from the person killed with the intention of inflicting bodily injury upon such person or of killing such person.'"[12]Id. at 813, 544 P.2d at 426 (emphasis added). Again, there was no question that malice was a required element to prove murder by an enumerated means.
The state's position is not only contrary to the law regarding murder by enumerated means, but seeks to expand the doctrine of felony murder when the weight of authority calls for restricting it. Many commentators criticize the felony-murder doctrine, and the trend has been to limit its applicability, not extend it. See Model Penal Code § 210.2 cmt. 6 at 29-42; LaFave & Scott, Criminal Law § 7.5, at 622-23, 632, 640-41.
Furthermore, first-degree murder by an enumerated means fundamentally differs from felony murder. Although child abuse, as discussed below, is a special case, the means originally enumerated in subsection (1)(a)use of poison, lying in wait, and torturedo not denote crimes. Thus, it cannot be presumed that they necessarily carry a felonious intent which can supply the malice necessary to characterize a killing as a murder. For example, friends and family who spring a surprise birthday party on a middleaged man as he steps into his home may be "lying in wait," but they are not liable for murder if he collapses and dies from a heart attack because they did not act with malice. As noted, lying in wait is defined as watching, waiting, and concealment from the person killed with the intention of killing or inflicting bodily injury upon that person.[13]See Moser, 91 Nev. at 812 & n. 3, 544 P.2d at 426 & n. 3. In effect, this definition places the requisite malice within the element of lying in wait.
Of course, a prosecutor would not charge murder in the case of a surprise party, but even wrongful acts involving an enumerated means and causing death may not constitute murder. For example, if a nurse carelessly administers a lethal dose of the wrong medicine to a hospital patient, he has killed someone by means of poison. But the nurse is liable for murder only if he acted with extreme recklessness regarding the risk to human life, "an abandoned and malignant heart." See Mattison, 93 Cal.Rptr. 185, 481 P.2d at 197 (holding that absent a specific intent by the defendant to kill, to find murder by means of poison, the jury had to find beyond a reasonable doubt that the defendant "had full knowledge that his conduct endangered the life of decedent, but that he nevertheless deliberately administered the poison with conscious disregard for that life").
Murder by torture warrants further discussion because the State has cited authority for the proposition that the malice required *446 for murder can be transferred from the commission of torture. This is the only authority that supports the state's position, and it provides support only if it can be extended to apply to murder by other enumerated means. However, it appears that no court has taken this approach with poison, lying in wait, or any other enumerated means. More important, we conclude that the approach is not sound even in regard to torture.
The Supreme Court of North Carolina reasoned that murder by torture "is analogous to felony murder in that malice may be implied by the very act of torturing the victim. Torture is a dangerous activity of such reckless disregard for human life that, like felony murder, malice is implied by the law." State v. Crawford, 329 N.C. 466, 406 S.E.2d 579, 587-88 (1991). The California Supreme Court also held: "When a killing is perpetrated by means of torture, the means used is conclusive evidence of malice and premeditation, and the crime is murder of the first degree." People v. Turville, 51 Cal.2d 620, 335 P.2d 678, 685 (1959), overruled on other grounds by People v. Morse, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33, 44 (1964).
Although as a practical matter malice may almost always be factually present when there is a killing by torture, the decisions in Crawford and Turville err in abandoning the established analysis of first-degree murder by enumerated means and concluding that, given torture, malice must be present as a matter of law. Such an approach introduces laxness and inconsistency into the application of a statute which defines first-degree murder by enumerated means in a uniform, reliable way. This lax approach is not sound because it is conceivable that torture, like other enumerated means, can be done without legal malice.[14]
Actually, although Turville has not been expressly overruled on this point, the California Supreme Court has since reiterated that to prove murder by torture, "[i]t must be established that the defendant intended to `cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity.' "Mattison, 93 Cal.Rptr. 185, 481 P.2d at 197 (quoting People v. Tubby, 34 Cal.2d 72, 207 P.2d 51, 54 (1949)). The required "untoward propensity" goes to the element of malice. The California Supreme Court has also explained that murder by torture is first-degree murder not because of the amount of pain inflicted but because of "the state of mind of the torturerthe cold-blooded intent to inflict pain for personal gain or satisfaction." People v. Steger, 16 Cal.3d 539, 128 Cal.Rptr. 161, 546 P.2d 665, 669 (1976). Therefore, the court has held that first-degree murder by torture is "murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." Id.; see also People v. Wiley, 18 Cal.3d 162, 133 Cal.Rptr. 135, 554 P.2d 881, 887 (1976). Further, in cases of murder by torture in California, the current standard jury instructions require the jury to find both malice aforethought and that "[t]he perpetrator committed the murder with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose." California Jury Instructions, Criminal 8.24 and accompanying use note (6th ed.1996). Thus, despite the unqualified statement made in Turville, malicious intent must be independently proved to establish murder by torture in California.
As already discussed, child abuse was added only recently to the means enumerated in NRS 200.030(1)(a) and is somewhat anomalous, but the State has not argued nor would we agree that this is a basis to treat it differently from the other enumerated means. To maintain coherency and rigor in the application of the statute, first-degree murder by child abuse can and must be proven in the same manner as the other three enumerated means. To reiterate, poison, lying in wait, and torture are not separate statutory offenses, but all are consistent with deliberate, premeditated action. Child *447 abuse, on the other hand, can denote a crime, but does not appear to do so in NRS 200.030(1)(a) because the statute provides its own definition of child abuse in subsection (6)(a) rather than referencing the independent offenses involving abuse or neglect of children proscribed in NRS 200.508. Child abuse more clearly diverges from the other three enumerated means in that it does not strongly correlate with deliberate, premeditated action since it can be and often is committed in a rash, impulsive manner. Therefore, it is critical that jurors expressly find malice aforethought before convicting a child abuser of first-degree murder under subsection (1)(a). Otherwise, a single rash, impulsive act by an otherwise decent parent leading to a child's deathan act which was abusive to the child but lacked legal malicewould constitute first-degree murder.[15]
Thus, unlike felony murder pursuant to NRS 200.030(1)(b), to establish that a killing is murder under subsection (1)(a), the State must prove that the killer acted with malice aforethought, i.e., with the deliberate intention unlawfully to take life or with an abandoned and malignant heart. See NRS 200.020. Proof of an enumerated means then establishes that the murder is of the first degree.
The jury instruction in this case improperly relieved the State of this requirement. For Collman's actions to constitute murder, the jury had to find that he acted with malice aforethought. This malice could not be presumed simply from his commission of child abuse pursuant to NRS 200.030(6)(a), i.e., physical injury of a nonaccidental nature to a child.

Harmless-error analysis
We conclude that the giving of instruction number 11 was harmless error beyond a reasonable doubt. Collman contends that the erroneous instruction concerning malice is not subject to harmless-error analysis under Thompson v. State, 108 Nev. 749, 838 P.2d 452 (1992). Therefore, Collman asserts, automatic reversal is required. We disagree.
We take this opportunity to clarify the issue of whether erroneous instructions omitting, misdescribing, or presuming an element of an offense are subject to a harmless-error analysis in light of Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In Neder, a case involving an erroneous instruction omitting an element of an offense from the jury's consideration, the United States Supreme Court concluded that such instructions are reviewable according to a harmless-error analysis. Id. at 13-15, 119 S.Ct. 1827.
Traditionally, this court has held that "violations of NRS 47.230 will not be deemed harmless where the erroneous instruction concerns an essential element of the offense charged." Hollis v. State, 96 Nev. 207, 209, 606 P.2d 534, 536 (1980). In Thompson, 108 Nev. at 755-56, 838 P.2d at 456-57, this court created exceptions to the traditional rule. Thompson concluded that an instruction establishing an improper mandatory presumption concerning an element of a crime is subject to a harmless-error analysis in "rare situations" such as: (1) where the defendant is acquitted of the offense on which the jury was improperly instructed; (2) where the defendant admitted the element on which the jury was improperly instructed; and (3) where no rational jury could find the predicate facts beyond a reasonable doubt without also finding the ultimate presumed fact. Id. at 756, 838 P.2d at 456-57.
In Neder, however, the Court recently rejected the view that only in these three "rare situations" can a jury instruction that omits, misdescribes, or erroneously asserts a conclusive presumption concerning an element of an offense be subject to a harmless-error analysis. Neder, 527 U.S. at 13-15, 119 S.Ct. 1827. Neder concluded that such errors are subject to a harmless-error analysis if they do not involve the type of jury-instruction error which "vitiates all the jury's findings" and produces "consequences that are necessarily unquantifiable and indeterminate." Id. at 10-11, 119 S.Ct. 1827 (citing Sullivan v. *448 Louisiana, 508 U.S. 275, 281-82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).
Notably, the Court also stated:
We have often applied harmless-error analysis to cases involving improper instructions on a single element of the offense. See, e.g., Yates v. Evatt, 500 U.S. 391 [111 S.Ct. 1884, 114 L.Ed.2d 432] (1991) (mandatory rebuttable presumption); Carella v. California, 491 U.S. 263 [109 S.Ct. 2419, 105 L.Ed.2d 218] (1989) (per curiam) (mandatory conclusive presumption); Pope v. Illinois, 481 U.S. 497 [107 S.Ct. 1918, 95 L.Ed.2d 439] (1987) (misstatement of element); Rose [v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)] (mandatory rebuttable presumption). In other cases, we have recognized that improperly omitting an element from the jury can "easily be analogized to improperly instructing the jury on an element of the offense, an error which is subject to harmless-error analysis." Johnson [v. United States, 520 U.S. 461, 469, 117 S.Ct. 1544, 137 L.Ed.2d 718] (citations omitted) ....
Neder, 527 U.S. at 9-10, 119 S.Ct. 1827.
Two of the cases cited above in Neder provide particularly strong support for our conclusion that the erroneous instruction in this case is subject to harmless error analysis: Yates v. Evatt, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), and Rose v.Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). As in the instant case, both Yates and Rose involved murder trials where erroneous instructions were given concerning presumptions applicable to the element of malice.
In Rose, for example, the jury was instructed that proof establishing beyond a reasonable doubt that a killing occurred created a rebuttable presumption that the killing was done maliciously. Rose, 478 U.S. at 574, 106 S.Ct. 3101. The Court ruled that "the error at issue here-an instruction that impermissibly shifted the burden of proof on malice-is not `so basic to a fair trial' that it can never be harmless." Id. at 580, 106 S.Ct. 3101 (citing Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). See also Clark v. Rose, 822 F.2d 596 (6th Cir.1987) (on remand from Supreme Court, the court of appeals applied harmless error analysis and concluded that the improper malice instruction was harmless).
Subsequently, in Yates, a murder case involving improper mandatory rebuttable presumption instructions on the element of malice, the Court set forth a two-step analysis for determining whether such instructions are harmless error.[16] The Court explained first that "[i]f ... the fact presumed is necessary to support the verdict, a reviewing court must ask what evidence the jury considered as tending to prove or disprove that fact." Yates, 500 U.S. at 404, 111 S.Ct. 1884. At issue is whether the jury looked only at the predicate facts or whether it considered "other evidence bearing on the fact subject to the presumption." The court should also apply the "customary presumption that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so." Id.
Second, Yates explained, the court reviewing for harmless error must "weigh the probative force of that evidence as against the probative force of the presumption standing alone." Id. The issue is "whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption." Id. If "the force of the evidence presumably considered is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of *449 the presumption[,]" then the reviewing court can conclude that the erroneous instruction did not contribute to the verdict rendered. Id. at 405, 111 S.Ct. 1884.
Accordingly, based on the Supreme Court's decisions in Neder, Yates, and Rose, we hold that where, as here, a jury-instruction error is not "structural" in form and effect, this court will henceforth review for harmless error improper instructions omitting, misdescribing, or presuming an element of an offense. To the extent that Thompson v. State, 108 Nev. 749, 838 P.2d 452 (1992) is inconsistent with this holding, Thompson is hereby overruled. Under the holdings discussed above, the error at issue in this case is clearly subject to harmless error analysis. Having so concluded, we now turn to an analysis of whether instruction number 11 was in fact harmless beyond a reasonable doubt.
Harmless-error inquiry requires us to ask and answer: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" Neder, 527 U.S. at 18, 119 S.Ct. 1827. If the reviewing court cannot reach this conclusion"for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary findingit should not find the error harmless." Id. at 19, 119 S.Ct. 1827.
We are convinced beyond a reasonable doubt that the erroneous instruction here did not induce the jury to find Collman guilty of murder without a finding of malice. It is clear that the jury believed that Collman acted with malice and thus would have found him guilty of murder even absent the erroneous instruction.
First, the jury was given proper guidance by the other instructions it received. Instruction number 7 correctly informed the jury that murder is "the unlawful killing of a human being, with malice aforethought, whether express or implied."
Pursuant to NRS 200.020, instruction number 10 correctly defined express malice as a "deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." Instruction number 10 also correctly stated that "[m]alice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart."
In addition, instruction number 12 provided:
In order to prove the crime of First Degree Murder By Child Abuse, the State must prove each of the following elements beyond a reasonable doubt:
1. [t]hat at the time and place indicated in the Information, the Defendant did willfully, feloniously and without authority of law
2. [k]ill a human being
3. with malice aforethought
4. by means of child abuse.
Pursuant to these instructions, it is reasonable to expect that the jury considered all of the evidence of express and implied malice revealed by our review of the entire record. In our view, that evidence is "so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." Yates, 500 U.S. at 405, 111 S.Ct. 1884.
Moreover, although at least one juror found as a mitigating circumstance in the penalty phase that Collman lacked the intent to kill, the jury was properly informed that malice could be implied when no considerable provocation appeared or all the circumstances of the killing showed an abandoned and malignant heart. Thus, the jury did not need to find that Collman specifically intended to kill Damian in order to find implied malice.
Second, during the penalty phase of the trial, the jury unanimously found as an aggravating circumstance that the killing of Damian involved torture. The district court instructed the jury that:
In order to find the aggravating circumstance of torture, the State must prove each of the following elements beyond a reasonable doubt:
(1) The defendant committed the act or acts with the intent to inflict cruel pain and *450 suffering upon a living human being for the purpose of revenge, extortion, persuasion, or for any sadistic purpose.
(2) The defendant did inflict cruel physical pain and suffering upon a living human being no matter how long its duration.
Torture must be beyond the act of killing.
The record reveals that the jury's finding of torture was based upon the evidence adduced during the guilt phase of the trial, as no new evidence on this point was offered during the penalty phase. Thus, the guilt phase evidence proved to the jury beyond a reasonable doubt that Collman intentionally inflicted cruel pain and suffering on Damian "for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." As explained above, if sufficiently reckless of human life, this state of mind constitutes implied malice. Third, the evidence established such recklessness here. Collman's ongoing and viciously abusive behavior toward Damian and the manner of Damian's death provided sufficient evidence to support a finding of both implied malice and torture.
We are convinced that the jury's unanimous finding that the killing of Damian involved torture established that the jury found that Collman killed the three-year-old victim with malice. Pursuant to the other proper instructions on malice that were provided to the jury, we are also convinced that the jury considered all the relevant and overwhelming evidence of malice presented at trial. We conclude beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of instruction number 11 and that therefore, the erroneous instruction concerning malice was harmless beyond a reasonable doubt.

XII. Evidence about the victim's mother in the penalty phase

At the penalty hearing, Collman moved to admit all the evidence the district court had excluded from the guilt phase regarding Stach: specifically, her alleged interest in the occult, her prior abortion, and her alleged lack of remorse over Damian's death. Collman intended to refute the state's torture allegation by establishing that Stach had been the one who tortured Damian the last few months of his life and it was "just fortuitous that [Collman] was the individual [who] inflicted the final abuse." The court denied the motion because the evidence was dubious, tenuous, and irrelevant to the penalty phase.
Collman contends that the district court denied him his "unfettered" right to present mitigating evidence. NRS 175.552(3) provides in part: "In the [penalty] hearing, evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence ...." (Emphasis added.) The United States Supreme Court has also announced that the trier of fact in a penalty phase of a capital case must consider evidence about the defendant and his offense; the Court does not require considering evidence about a prosecution witness. See Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
No case law or statute requires admission of witness character evidence in a penalty hearing. The hearing in the instant matter was about Collman, Damian, and Collman's crime, not about Stach. "[Q]uestions concerning the admissibility of evidence during the penalty phase of a capital murder trial are generally left to the trial judge's discretion." Emil v. State, 105 Nev. 858, 864, 784 P.2d 956, 960 (1989). The district court here correctly concluded that the evidence was irrelevant to the penalty phase proceedings. That Stach allegedly had an interest in the occult, had an abortion, and allegedly lacked remorse remained irrelevant to the offense for which Collman was convicted. Accordingly, we conclude that the district court did not abuse its discretion by denying Collman's motion to admit this evidence.

XIII. Statutory review of the death sentence in this case

Collman contends that the death sentence is not appropriate in this case. He reiterates the mitigating circumstances found by the jurors and claims that the death penalty *451 resulted from emotion and passion. Pursuant to NRS 177.055(2), we have reviewed Collman's death sentence and conclude that the evidence supports the aggravating circumstances, that the sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor, and that the sentence is not excessive, considering both Collman and his crime.
At the penalty phase, the State reasserted the evidence presented at the guilt phase and introduced other evidence of Collman's violent temper and previous instances of abuse. The jury found the existence of two aggravating circumstances, torture and victim under fourteen years old. See NRS 200.033(8), (10). The jury found six mitigating circumstances: no significant criminal history, job history, cooperation with law enforcement, lighter sentence for Stach, lack of intent to kill, and no flight of any kind. After determining that the mitigating circumstances did not outweigh the aggravating circumstances, the jury sentenced Collman to death.
We conclude that the evidence supported both the aggravator of torture, as discussed earlier in this opinion, and the aggravator of victim under fourteen. There is no indication that the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor. Nor is the sentence excessive, considering Collman and his crime. In addition to the details of Collman's mistreatment and murder of Damian, the jury heard evidence that Collman had a long history of severely mistreating women and children and derived pleasure from their fear and pain. Angela Collman, Collman's former wife, described in detail how Collman abused, controlled, raped, and threatened her throughout their marriage. She further testified that while she was pregnant with their daughter, Kendra, Collman put a gun to her stomach because she refused to have an abortion. Angela testified that Collman was rough with Kendra and once dropped her into her bassinet from a height of two feet. Angela also related an incident where she was driving sixty to seventy miles per hour and Collman held Kendra out the car window, threatening to drop her if Angela stopped the car or slowed down. Naomi Wade, Collman's former girlfriend, also testified to the abuse she endured from Collman. Collman liked to see her cry and would choke, hit, and punch her, slam her against the wall, and spit on her.
Finally, although a lack of intent to kill was found as one mitigator, this does not prohibit imposition of the death penalty. Collman did not raise this issue on appeal, but it is clear that the death penalty is not prohibited here even if Collman did not specifically intend to kill Damian. The United States Supreme Court has held that reckless disregard for human life may be sufficient to warrant a death sentence even when a defendant has no specific intent to kill. See generally Tison v. Arizona, 481 U.S. 137, 146-58, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

CONCLUSION
Although instruction number 11 erroneously instructed the jury on the requirement of malice aforethought, we conclude that the error was harmless. We therefore affirm Collman's conviction and death sentence.
YOUNG, SHEARING, LEAVITT and BECKER, JJ., concur.
MAUPIN, J., concurring:
I agree that defects in jury instructions defining the elements of a charged crime may be the subject of a harmless error analysis under Neder. However, our embrace of the United States Supreme Court decision in Neder does not involve a mere clarification of our prior decision in Thompson v. State, 108 Nev. 749, 838 P.2d 452 (1992). Rather, our decision today comprehensively expands the basic proposition of law articulated in that opinion.
The majority is careful to observe that it is "critical" for juries to be instructed on the need to prove malice, express or implied, before convicting a defendant of murder under NRS 200.030(a)(1). See Graham v. State, 116 Nev. ____23, 992 P.2d 255 (2000). This underscores the care that should be exercised in the application of Neder to these matters. Here, the majority's conclusion that the defects in the instruction constitute harmless error did not subject Collman to *452 criminal liability for murder based upon a "single rash, impulsive act by an otherwise decent parent." Overwhelming evidence demonstrated that Collman serially and maliciously abused a small and defenseless toddler. On these facts, the jury could not have been misled by the instruction regarding the element of malice.
I would also separately comment on the marginal nature of Collman's alternative defense, to wit: that Damian's mother was the perpetrator. First, the need to take the child to the hospital occurred while Collman was alone with the child. Second, substantial circumstantial evidence confirms that the final physical insult to this child did not occur at any other time or by means other than by child abuse. Thus, the trial court's refusal to admit extraneous evidence regarding the mother's conduct before and after Damian Stach's demise does not dictate reversal of Collman's conviction.
While resort to a harmless error analysis in these cases should be the exception rather than the rule, I agree with the majority that the error in this case was harmless beyond a reasonable doubt.
ROSE, C.J., dissenting:
I concur in the majority's cogent analysis that it was error to give instruction # 11, which states that malice aforethought, an essential element of the crime of murder, is conclusively established when death by child abuse has been proven. However, I disagree with the majority that we should discard our long-established precedent that prohibits harmless error analysis from being used to excuse jury instructions that fail to include all the essential elements of the crime. Instead, I would prefer to stay with the time-honored rule that such errors are so fundamental to due process and fairness that they cannot be considered harmless. For this reason and the fact that I conclude that admissible evidence was improperly excluded, I would reverse this case and remand for a new trial.
This court has held that there are a few types of error that are so fundamental to our concept of justice that harmless error analysis is inapplicable. See Thompson v. State, 108 Nev. 749, 838 P.2d 452 (1992). A jury instruction that incorrectly states the elements of the charged crime is one of them.
In Thompson, we held that where the jury instructions fail to correctly state all of the elements of the crime, we will permit harmless error analysis only in certain limited circumstances. These circumstances are: (1) where the defendant is acquitted of the offense on which the jury was improperly instructed; (2) where the defendant admitted the element on which the jury was improperly instructed; and (3) where no rational jury, having already found the predicate facts beyond a reasonable doubt, could find those facts without also finding the ultimate presumed fact. See id. at 756, 838 P.2d at 456-57.
As none of these circumstances is present here, the inclusion of a jury instruction that omits an essential element of the crime is not harmless, and thus warrants reversal. The majority, however, alters the harmless error jurisprudence of this state by relying on Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), a recent United States Supreme Court decision in a federal property crime case.
In Neder, the United States Supreme Court held that a trial court's failure to include all the essential elements of the crime in the jury instruction is subject to harmless error analysis. This holding, however, is in no way binding upon us, and the dissent, written by Justice Anton Scalia, persuasively articulates why adopting this new rule is erroneous and invades the province of the jury.
In accord with the dissent in Neder, I believe that the right to be tried by a jury, a guarantee that is central to the Constitution, includes the right to have the jury determine the guilt or innocence of a defendanta determination that necessarily requires proof of all elements of a crime. Thus, "the right to render the verdict in criminal prosecutions belongs exclusively to the jury; reviewing it belongs to the appellate court." Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 1848, 144 L.Ed.2d 35 (1999) (Scalia, J., dissenting).
*453 The majority of this court, however, applies the harmless error analysis and asks whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty" absent the erroneous instruction. Thus, the majority essentially steps into the shoes of the jury and fills in "gaps" necessary to the verdict. While I believe that harmless error analysis may properly be used to review a verdict under the circumstances outlined in Thompson, such analysis only applies when the jury actually renders a verdictthat is, when the jury has considered all the elements of the crime and found the defendant guilty.
Although I disagree with the majority's general conclusion that harmless error review applies to "instructions which omit, misdescribe, or presume an element of an offense," I also have concerns with the majority's application of harmless error analysis to the facts of this case. The majority concludes that the use of the erroneous instruction, which omitted an essential element of the crime of murder, was harmless because: (1) the jury was given one proper instruction, jury instruction # 10, that defined implied malice on which the jury could have relied; and (2) the jury's finding of torture in the penalty phase provided sufficient evidence to support a finding of implied malice in the guilt phase. I strongly disagree with these conclusions.
First, it is mere speculation to assume that the jury relied on instruction # 10 because there is no evidence in the guilt phase so indicating. During the guilt phase, rather than convicting Collman of first-degree murder based on a finding of implied malice, the jury could have relied on the improper mandate set forth in instruction # 11, and thus concluded that malice was established solely because the murder occurred "by means of child abuse." Because it is unclear, and particularly because it is not "clear beyond a reasonable doubt," that the jury made any finding in the guilt phase with respect to malice aforethought, I cannot say that this error was harmless.
Second, I disagree with the majority that we can bootstrap findings made in the penalty phase to cure errors made in the guilt phase. By statute, the guilt and penalty phases of a criminal trial are separate hearings in which different evidentiary rules apply. See NRS 175.552. Often, in the penalty phase, the jury hears evidence concerning a defendant that was inadmissible during the guilt phaseevidence that the jury was forbidden from considering in determining the guilt or innocence of the accused. Therefore, because the rules of evidence, the ultimate purpose, and the overall tenor of these two proceedings are vastly different, I cannot conclude that the jury's finding of torture in the penalty hearing equates to a finding of implied malice in the guilt phase. Further, using penalty phase findings to cure errors in the guilt phase may result in harsher and unequal treatment for death penalty defendants who do not have the option to waive such a hearing. See NRS 175.552(2) ("In a case in which the death penalty is not sought, the parties may by stipulation waive the separate penalty hearing ...."). Thus, I conclude that based on the erroneous jury instruction alone, reversal is warranted in this matter.
To compound matters, I believe that the trial court improperly excluded relevant, admissible evidence. One of Collman's defenses was that Stach was the abuser and killer of Damian. This included specific evidence of Stach slapping Damian across the face with her hand hard enough to draw blood and across the buttocks with a spatula, beating Damian across the hands and over his body with a wooden spoon, and Stach bragging that she gave Damian a very noticeable black eye for misbehaving. Despite Collman's defense, the State put forth great effort to show that the bite marks that could be identified on Damian's body were inflicted by Collman. One dental expert was called by the State to testify that the bite marks matched Collman's teeth. Collman countered by presenting three expert witnesses who testified that the bite marks were not Collman's and that the bite mark evidence was inconclusive. Accordingly, whether there were any bite marks, let alone who inflicted them, were central issues at trial.
To bolster his defense that Stach inflicted the bite marks, Collman attempted to introduce *454 evidence that Stach was interested in vampirism and the occult. This evidence included items of vampire literature, two dots tattooed on Stach's neck to resemble a vampire bite,and the fact that Stach had given her son a name that closely resembled the child devil's designation in a popular movie. Collman alleged that this evidence was probative because, in a matter where two people were accused of biting another, it was more probable that the biting was done by someone who was involved in vampirism and the occult.
The State, however, argued against admission of this evidence alleging that it was irrelevant and that Stach had recently rejected her vampire practices and beliefs. The district court agreed, and no evidence of Stach's vampire proclivities was admitted into evidence. Normally we permit the district court substantial discretion in determining what constitutes relevant evidence, but we have also held that the district court's exercise of its discretion must not prohibit a defendant from presenting his or her full defense. See Stinnett v. State, 106 Nev. 192, 196, 789 P.2d 579, 582 (1990); Vincent v. State, 97 Nev. 169, 170, 625 P.2d 1172, 1173 (1981). Moreover, a defendant in a death penalty case is generally afforded greater latitude in the presentation of evidence. See U.S. v. Stevens, 935 F.2d 1380, 1404-05 (3rd Cir.1991). With these principles in mind, I believe that the vampire propensities of Stach should have been received into evidence, and that the district court erred in not permitting Collman to present this evidence.
Further, the evidence of Stach's interest in vampirism and the occult at the time Damian was being abused could have affected the jury's finding of torture as an aggravating factor during the penalty phase of Collman's trial. Such evidence may well have led the jury, or certain of its members, to conclude that Stach was more likely the one who inflicted the bite marks on Damian, especially in light of Stach's guilty plea for child neglect. Thus, the jury may ultimately have concluded that the aggravating factor of torture could not be found beyond a reasonable doubt. This would then leave one aggravating factor against six mitigating factors, with one of the mitigating factors being that Collman did not intend to kill Damian.[1] Accordingly, I believe that the decision to impose the death penalty may well have been different had Collman been permitted to present the evidence of Stach's practice and interest in vampirism and the occult.
Finally, the district court's error in refusing to admit evidence to show Stach's vampire practices and beliefs is compounded by the fact that the district court allowed the State to present remote, tenuous evidence of Collman's guilt. Specifically, the district court allowed the State to enter evidence suggesting that Collman was not remorseful over killing Damian because he propositioned Stach for sex around the time of Damian's funeral. I see, at best, an attenuated relationship between sexual desire and lack of remorse. Moreover, my colleagues in the majority point out the inconsistent evidentiary rulings made by the district court in that evidence of Collman's sexual desires were deemed admissible, whereas evidence concerning Stach's sexual desiresmainly propositioning another for sexual relationswas deemed irrelevant, prejudicial, and incredible. Throughout the trial, it appeared that the relevancy of the State's evidence was upheld, but the converse was not true when Collman attempted to present evidence in his own behalf.
In conclusion, I think it is a mistake to apply the harmless error rule to an error so fundamental as the correct statement of the elements of the crime and there is no compelling reason to reverse our prior authority that refused to overlook this type of substantial error. Further, Collman was prevented from presenting evidence that would have had a tendency to show that Stach was the one who had inflicted the bite marks on *455 Damian. In reviewing death penalty cases, we are instructed by the United States Supreme Court that we are to do so with a heightened sense of scrutiny. See, e.g., Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). It seems to me that the majority has done just the opposite in this case. I would reverse this case and remand it for a new trial.
NOTES
[1] No allegations were made that Collman or Stach abused or neglected Damian's brother, Darian. After the events in this case, Richard became Darian's guardian.
[2] Apparently, Damian did not bruise excessively between June and October 1995, when Collman was in Ely and Damian was in Las Vegas. However, one of Damian's particularly serious facial bruises in December 1995 evidently resulted when the dog accidentally knocked Damian into a fence post.
[3] The district court followed the decision in United States v. Stevens, 935 F.2d 1380, 1404-05 (3rd Cir.1991), which used a reduced standard when determining whether prior act evidence introduced by the defendant should be admitted. The United States Court of Appeals for the Third Circuit held that in such a situation, the trial court need only decide that the prior act evidence has a tendency to negate the defendant's guilt and that the probative value is not substantially outweighed by the danger of unfair prejudice. Id. at 1405. Because no risk of prejudice to the defendant is present if the acts are admitted, the Third Circuit concluded that a less stringent standard is justified. Id. at 1404.
[4] Collman does not make this argument, but we note that the evidence in question was also not admissible under NRS 50.285(2), which provides that "facts or data need not be admissible in evidence" if they are "of a type reasonably relied upon by experts in forming opinions or inferences." This provision might have provided the best basis for admitting the evidence in Emmons since the radiologist's considered opinion set forth in a letter appears to be information which an expert like the medical examiner would reasonably rely on. By contrast, we conclude that Dr. Sperber's recollection of oral comments made to him by colleagues under the circumstances he described could not be offered to jurors as facts or data "reasonably relied upon by experts in forming opinions or inferences."
[5] We note that the continuing validity of this holding is in doubt. The Moore decision adopted the reasoning and rationale of People v. Geiger, 35 Cal.3d 510, 199 Cal.Rptr. 45, 674 P.2d 1303 (Cal.1984). Geiger has now been overruled by People v. Birks, 19 Cal.4th 108, 77 Cal.Rptr.2d 848, 960 P.2d 1073 (1998). In Birks, the California Supreme Court noted that the rationale for the Geiger decision has been "unequivocally repudiated by the United States Supreme Court." Birks, 77 Cal.Rptr.2d 848, 960 P.2d at 1082 (citing Hopkins v. Reeves, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998)). For the purposes of this decision, however, we have applied the standards adopted in Moore and have concluded that Collman's claim is nevertheless without merit.
[6] Cause appearing, we deny Collman's motion to allow supplemental oral argument on this issue, filed December 20, 1999.
[7] Nevada's statutory definition of murder also extends beyond the common law, including the unlawful killing of a human being "caused by a controlled substance which was sold, given, traded or otherwise made available to a person in violation of chapter 453 of NRS." NRS 200.010.
[8] Nevada law has apparently never expressly addressed intent-to-do-serious-bodily-injury murder, but this court has recognized the concept in regard to murder perpetrated by means of lying in wait. See note 13 and the accompanying text below.
[9] The legislature recently added a fourth kind, involving school-related killings. See 1999 Nev. Stat., ch. 319, § 3, at 1335.
[10] Though Nevada's code now appears to be in the minority, for many years statutes commonly deemed poison, lying in wait, and torture to be predicates of first-degree murder. See LaFave & Scott, Criminal Law § 7.1(a), at 605, and § 7.7(c), at 646; Model Penal Code § 210.2 cmt. 2 at 16. By contrast, child abuse was added to NRS 200.030(1)(a) just ten years ago. See 1989 Nev. Stat., ch. 408, § 1, at 865.

The most recent legislative session resulted in the removal of child abuse from subsection (1)(a) and its placement in (1)(b), the felony murder subsection. See 1999 Nev. Stat., ch. 319, § 3, at 1335.
[11] The State also invokes the legislative history of the bill which added child abuse to the enumerated means in NRS 200.030(1)(a), emphasizing that legislators intended to make murder by child abuse murder of the first degree. However, this legislative intent is not in dispute and has no bearing on the question in this case: did the jury instruction improperly dispense with the state's burden to prove malice?
[12] On the required intent regarding bodily injury, see note 13 below.
[13] Moser and Leonard v. State, 114 Nev. 639, 655-56, 958 P.2d 1220, 1232 (1998), cert. denied, 525 U.S. 1154, 119 S.Ct. 1059, 143 L.Ed.2d 64 (1999), actually understate the required intent regarding bodily injury and are hereby clarified. To constitute malice for murder, the standard is intent to inflict "serious" (or "grievous" or "great") bodily injury. See LaFave & Scott, Criminal Law § 7.3, at 617; cf. Thomas, 261 P.2d at 7 ("[T]he defendant must intend to commit acts that are likely to cause death and that show a conscious disregard for human life.") (Traynor, J., concurring). Nevada's statutory code does not expressly include this form of malice aforethought, but intent to do serious bodily injury constitutes implied malice, "an abandoned and malignant heart," if it is sufficiently reckless. See LaFave & Scott, Criminal Law § 7.3, at 616-17; Model Penal Code § 210.2 cmt. 5 at 28.
[14] For example, a man discovers that the kidnapper of his infant daughter has placed her in a safe. The baby will soon suffocate, but the kidnapper refuses to open the safe or divulge the combination. Desperate, the man tries to torture the kidnapper into revealing the combination but does not intend to kill him. If the kidnapper dies, the man is not guilty of murder.
[15] Whether such a scenario would properly establish a predicate felony for first-degree murder under current NRS 200.030(1)(b) is not at issue here.
[16] We recognize that language in Yates relating to the standard of review for jury instructions was subsequently disapproved in Estelle v. McGuire, 502 U.S. 62, 72-73 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Estelle acknowledged that Yates could be read as endorsing a standard of review that was different from the standard articulated in Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The Court reaffirmed that the Boyde standard remains the proper formulation, i.e., whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. Yates otherwise remains valid precedent, and the language in Yates that was disapproved in Estelle is not implicated in our conclusion that the instruction at issue here is subject to harmless error analysis.
[1] At least one and perhaps all of the jurors found that Collman did not intend to kill Damian. While the United States Supreme Court has held that a defendant may be given the death penalty even though he or she did not intend to kill the victim, see Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), I believe the state courts should be reluctant to affirm the death penalty in such a case where a substantial error was admittedly made at trial and the defendant was prevented from presenting key evidence on an important issue.